[No. C059777. Third Dist. Oct. 15, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
LOUI MAHMOUD ASSAD, Defendant and Appellant.

**COUNSEL**

Thea Greenhalgh, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, David A. Rhodes and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROBIE, J.**—In this case, we conclude defendant's trial counsel was not ineffective in failing to request a jury instruction that would have directed the jury to consider whether evidence of defendant's cultural background raised a reasonable doubt as to whether defendant had the requisite intent to inflict torture and aggravated mayhem on his son when defendant physically disciplined him. Defendant was not entitled to the jury instruction he now proposes because his proposed instruction would have constituted an improper comment on the evidence.

A jury found defendant Loui Mahmoud Assad guilty of torturing his son, Y. (count 1), committing aggravated mayhem on Y. (count 2), five counts of inflicting corporal injury on Y. (counts 3–7), and one count of inflicting corporal injury on his daughter N. (count 9). The jury found that when inflicting corporal injury on Y. (counts 3–7) defendant personally inflicted great bodily injury. It acquitted him of one count of inflicting corporal injury on Y. (count 8) and one count of inflicting corporal injury on his other daughter, R. (count 10).[1]

The trial court sentenced defendant to prison for a determinate term of nine years, consisting of the six-year upper term on count 5 plus three years for the enhancement, followed by concurrent indeterminate terms of life with the possibility of parole on counts 1 and 2. The court imposed concurrent terms

---

[1] *Inexplicably, both parties state in their briefs that defendant was* convicted, *not acquitted,* of count 8. In fact, in part IV of his opening brief, defendant contended there was insufficient evidence to support his conviction on this count. He later withdrew the contention but did not reference his acquittal on the count.

of nine years on counts 6, 7, and 9. The court stayed sentence on counts 3 and 4 pursuant to Penal Code[2] section 654.

On appeal, defendant contends (1) his trial counsel was ineffective in failing to request a pinpoint jury instruction on his "cultural defense"; (2) there was insufficient evidence to support his convictions for aggravated mayhem and torture; and (3) his sentences on counts 1 *or* 2 *and* 5 through 7 must be stayed pursuant to section 654. Finding no merit in these arguments, we will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On Sunday, September 9, 2007, defendant, age 35, disciplined his 12-year-old son, Y., for allegedly not listening to him. Defendant used black electrical tape to bind Y.'s hands together and then to bind them to the metal frame of defendant's bed. Y.'s feet were also bound to the bed with electrical tape, with one foot on each side of the bed. While Y. was lying facedown, defendant struck him several times on his back and legs using a wooden garden stake and a short piece of garden hose that had a metal nozzle on one end. After a short break, defendant did it again, and Y. yelled out in pain both times. In addition, defendant bit most of Y.'s fingertips, biting each finger one at a time while Y. yelled in pain.

The next day, a Monday, Y. stayed home from school. Defendant tied Y.'s hands and feet to the bed again, but this time Y. was face up and the beating occurred on the front side of his body.

The following day Y., a seventh grade student, returned to school and was taken to the principal's office because of concern for his health. Two of his teachers had noticed that Y. had a black eye and cuts on his face, he was limping and moving very slowly, he kept falling asleep during class, and he was trying to keep the weight of his backpack off of his shoulder. When Y. arrived at the office, the principal noticed that Y. "looked very gray," "his left eye [wa]s black, he [had] scratches below it, and he ha[d] a scratch on his chin and on the right side of his upper lip." Additionally, even though it was a warm day, Y. was wearing a long-sleeve shirt and a T-style undershirt.

The principal asked Y. several times how he got the injuries, and each time he told her that he had hurt himself falling off of his bicycle. Y. lied to the principal because he did not want to get defendant in trouble. The principal did not believe Y., so school personnel called child protective services and the police.

---

[2] Further undesignated section references are to the Penal Code.

The recent amendments to section 4019 do not operate to modify defendant's entitlement to custody credits, as he was committed for violent felonies. (§ 4019, subds. (b) & (c); Stats. 2009, 3d Ex. Sess. 2009–2010, ch. 28, § 50.)

When child protective services and the police arrived, Y. was brought back to the principal's office. He told the investigators the same thing he had told the principal, i.e., that his injuries resulted from a bicycle accident. The investigators asked Y. to roll up the sleeves of his shirt and to lift up his shirt, but Y. refused to do so in an effort to protect defendant.

Shortly thereafter, defendant arrived at the school to pick up his children. Defendant first told the police that Y. had been injured in a bicycle accident. After it became clear the police did not believe the bicycle accident story, however, defendant told the police he loses his temper sometimes and he had whipped Y.'s back one time. At that point, defendant was arrested.

Thereafter, Y. was taken to a hospital for a physical examination. During the initial stages of the exam, a physician's assistant noticed that Y. had bruises on his face and on both sides of most of his fingertips. After removing Y.'s clothing, it became evident that he had "multiple injuries to his chest, . . . arms, back, . . . fingers, and his legs." He had "significant . . . bruising to his posterior—his thighs, his inner thighs, his feet, even his shoulders." He also had an "almost circumferential or completely 360 [degree] around his chest wall from his waist to his—about his shoulder or mid nipple line was severely bruised with abrasions, open lesions, and multiple stages. So it's difficult to tell how old they were. Some were probably pretty fresh [and] some were probably several days if not weeks old."

During the examination, Y. stated that his voice was hoarse as a result of being choked by defendant. Y. said that defendant had caused his injuries by punching him, hitting him with a piece of garden hose, and biting his fingers.

Previously, defendant had used other similar methods of discipline. For instance, he used to strike the tops and bottoms of Y.'s feet with a belt, sometimes until Y.'s toenails turned black and blue. Defendant also hit Y.'s hand with a stick, and he struck Y.'s head with a spoon and a "glass thing." A few months earlier, in July 2007, defendant had punched Y. in the mouth, splitting his lip and necessitating stitches. On another occasion, defendant heated a knife on a stove burner and then placed the hot blade on Y.'s foot, causing his skin to burn.

Defendant also physically disciplined his two daughters, eight-year-old N. and 14-year-old R. Defendant slapped N. in the face and on her back and also pulled her by the ear. Defendant hit R. on her hands with a wooden rolling pin and slapped her in the face.

In February 2008, Dr. James Crawford, a physician with expertise in the medical evaluation of child abuse, examined Y. Dr. Crawford noted that Y. "had very extensive scarring [on] his torso and his upper extremities."

Because the scars "were still quite . . . visible" five months after the beating, Dr. Crawford testified that the marks would be a "permanent disfigurement." He testified that, "other than children who've had extensive burn injuries, these [we]re definitely among the most prominent and extensive scars [he had] ever seen."

During the examination, Y. told Dr. Crawford that defendant had caused the injuries. When asked if the scarring was consistent with being beaten with the metal end of a hose, Dr. Crawford answered, "[i]f it was extremely violent, yes." The scars were consistent with "[v]ery violent physical abuse."

Defendant testified on his own behalf. He denied disciplining Y. on Sunday, September 9, 2007, but he admitted doing so the following day. Y. was "acting funny, weird," and defendant discovered that Y. had been looking at a photograph torn from a magazine. The picture included a man and a naked woman. Defendant admittedly became angry, went outside and grabbed the small portion of garden hose, came back in the house, and used it to strike Y. on his back. Defendant then pulled Y. to another room of the house and "hit him some more," this time on his back and legs. Defendant next took Y. to the bedroom, tied his hands and feet to the bed, and hit him with the hose several more times. The next day, defendant told the police he had hit Y. with the hose.

Defendant testified that approximately six months before the September 2007 incident, he had hit Y. with the garden hose. Defendant admitted slapping N. on one occasion and hitting R.'s hand with a wooden stick. Defendant did not intend to cause the injuries. He admitted he had lost sight of what was going on.

In her testimony, R. said that, in their religion, it is the parents' responsibility to have the children act correctly. Moreover, in Syria, "it's okay to hit your kid," "if you have good reason." Although she claimed corporal punishment was acceptable under the standards of Syria and R.'s religion, she tried to intercede in defendant's beating of Y. because "common sense" required her to do so.

Mutaher Abdulla, who is married to defendant's aunt, testified that in Syria and Yemen it was acceptable to use physical punishment on children. Parents or teachers could "beat up the kids" and could "use instruments." He did not believe defendant "intended" to cause his children's injuries. Instead, he believed defendant got angry and lost control.

Ali Hussein, who is married to one of defendant's sisters, testified that defendant could not injure his children "intentionally" or "on purpose." Knowing that Y. had been tied to the bed and hit repeatedly would not change Hussein's opinion.

Mahmoud Daher, defendant's cousin, testified that defendant was not the type of person who could "intentionally" inflict the injuries shown in a photograph of Y. Daher conceded, however, that the injuries shown in the photograph were intentional rather than accidental.

Oumaimah Assad, defendant's brother, testified that defendant would not injure his children intentionally or on purpose.

Hassan Daher, defendant's uncle, and Fatimah Abdulla, defendant's aunt, testified that defendant is not the type of person who would intentionally inflict on a person the type of injuries shown in the exhibits.

Mohammed Daher, defendant's cousin (a recent medical school graduate), testified that defendant is not the type of person who would intentionally inflict the injuries shown in the exhibits. He conceded, however, that the exhibits depicted some of the worst abuse he had seen.

## DISCUSSION

### I

#### *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to support his convictions of aggravated mayhem and torture. Neither argument has merit.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the prosecution, and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury." (*People v. Boyer* (2006) 38 Cal.4th 412, 479–480 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

### A

#### *Aggravated Mayhem*

Section 205 provides in relevant part as follows: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of

another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill."

■ Aggravated mayhem requires the specific intent to cause the maiming injury. (*People v. Park* (2003) 112 Cal.App.4th 61, 64 [4 Cal.Rptr.3d 815]; *People v. Ferrell* (1990) 218 Cal.App.3d 828, 833 [267 Cal.Rptr. 283].) "Evidence that shows no more than an 'indiscriminate attack' is insufficient to prove the required specific intent." (*Park*, at p. 64, quoting *Ferrell*, at p. 835.) " 'Furthermore, specific intent to maim may not be inferred solely from evidence that the injury inflicted actually constitutes mayhem; instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately.' " (*Park*, at p. 64.)

Here, there is no dispute defendant permanently disfigured Y. Thus, the only issue is whether there was sufficient evidence for the jury to find that defendant acted with the requisite specific intent.

The evidence shows that defendant consciously chose to beat Y. with a garden hose that had a metal fitting on the end of it. Using the metal tip of the hose, defendant knowingly struck Y. several times on his back, his chest and stomach, his sides, and his legs.

Additionally, the attack consisted of three separate beatings that occurred over a two-day period, with time in between each occurrence. On each day, defendant took the time to bind Y.'s hands and feet to the bed, thereby ensuring that Y. could not get away and end the beatings. Even if the initial beating, despite its severity, could be considered "indiscriminate" (*People v. Anderson* (1965) 63 Cal.2d 351, 359 [46 Cal.Rptr. 763, 406 P.2d 43]; *People v. Sears* (1965) 62 Cal.2d 737, 745 [44 Cal.Rptr. 330, 401 P.2d 938], overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509–510, fn. 17 [20 Cal.Rptr.2d 582, 853 P.2d 1037]), the jury reasonably could have found that the succeeding attacks were not.

Furthermore, there was evidence defendant had been beating Y. severely for several years, requiring hospital visits. On another occasion, defendant had heated a knife blade on a stove burner and then placed the hot blade on the top of Y.'s foot, causing a burn.

■ These facts and circumstances, when viewed together with those showing that Y.'s injuries actually constituted mayhem (*People v. Park, supra*, 112 Cal.App.4th at p. 64), allowed the jury to infer that defendant intended to permanently disfigure Y. during the beatings. Any reasonable person would

know that repeatedly striking a person's body with the metal fitting of a hose and placing a burning hot knife against the person's skin would likely cause permanent disfigurement. There was sufficient evidence to support the aggravated mayhem conviction. (*People v. Boyer, supra,* 38 Cal.4th at pp. 479–480.)

B

*Torture*

Section 206 provides as follows: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain."

■ " 'Courts have interpreted intent to inflict "cruel" pain and suffering as intent to inflict extreme or severe pain . . . .' [Citation.]" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1426 [89 Cal.Rptr.3d 402].) "[T]he intent to cause severe pain need not be proven by direct evidence, but can be inferred from the circumstances of the offense, such as a focused attack on a particularly vulnerable area. [Citation.]" (*Id.* at pp. 1429–1430.) More specifically, "a jury could reasonably determine that a person who deliberately strikes his victim on an area of the body that is already injured has the intent to cause severe pain . . . ." (*Id.* at p. 1430.)

The evidence showed that defendant struck Y. repeatedly in the front, back, and sides of his torso. The jurors reasonably could have found that many of those blows occurred after Y. had already suffered injuries to the same regions of his body.

*People v. Steger* (1976) 16 Cal.3d 539 [128 Cal.Rptr. 161, 546 P.2d 665], on which defendant relies, is distinguishable. Although the child victim's body was covered by injuries "from head to toe," the court's only discussion of *repetitive* beatings involved daily beatings of the buttocks using a belt or shoe. (*Id.* at p. 543.) The court neither identified any specific *injury* that had resulted at that locus nor considered whether the defendant subsequently battered the same area following the earlier injury. Thus, *Steger* is not contrary to the analysis in *Hamlin.*

Defendant also relies on *People v. Walkey* (1986) 177 Cal.App.3d 268 [223 Cal.Rptr. 132], which followed *Steger* and is distinguishable for the same reason. Nothing in *Walkey* undermines the analysis in *Hamlin* or suggests that

the evidence in the present case is insufficient. Defendant's mayhem and torture convictions are supported by substantial evidence.

## II

### *Ineffective Assistance of Counsel*

Defendant contends his trial counsel rendered ineffective assistance by having failed to request a pinpoint jury instruction on defendant's "cultural defense." We are not persuaded.

" ' "[I]n order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citation.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Avena* (1996) 13 Cal.4th 394, 418 [53 Cal.Rptr.2d 301, 916 P.2d 1000].)

Defendant asserts his defense was based "on the fundamental premise that [his] cultural perceptual framework negated any inference of the intent required for both the mayhem and torture charges." He asserts that while his trial attorney argued this issue to the jury, the attorney "failed to request any instruction that would have pinpointed his defense and explained to the jury the import of the evidence with which they were presented." According to defendant, an appropriate instruction on his "cultural defense" could have stated as follows: "You have heard evidence that child-rearing practices and disciplinary or punishment techniques are significantly different in Syrian culture than what is acceptable in the U.S. [Defendant] has presented evidence that may tend to explain his behavior based on cultural considerations which may have affected his perceptions and behavior at the time of the charged acts. You may take this evidence into consideration when determining [defendant]'s intent. It is the prosecution that has the burden of proving the defendant guilty beyond a reasonable doubt. Therefore, the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt based on the cultural variance evidence presented. Such evidence may itself leave you with a reasonable doubt. If after considering all the evidence, including cultural evidence, you have a reasonable doubt that the defendant committed the offense, you must find the defendant not guilty."

We reject defendant's ineffective assistance of counsel claim because this is not a proper pinpoint instruction but instead is an impermissible comment on the evidence, and therefore his trial attorney acted reasonably in not requesting that instruction.

■ Our Supreme Court has "suggested that 'in appropriate circumstances' a trial court may be required to give a requested jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged." (*People v. Bolden* (2002) 29 Cal.4th 515, 558 [127 Cal.Rptr.2d 802, 58 P.3d 931].) "But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation]," and "[a]n instruction that does no more than affirm that the prosecution must prove a particular element of a charged offense beyond a reasonable doubt merely duplicates the standard instructions defining the charged offense and explaining the prosecution's burden to prove guilt beyond a reasonable doubt. Accordingly, a trial court is required to give a requested instruction relating the reasonable doubt standard of proof to a particular element of the crime charged only when the point of the instruction would not be readily apparent to the jury from the remaining instructions." (*Id.* at pp. 558–559.)

Here, to the extent the purpose of defendant's proposed instruction was to relate the reasonable doubt standard of proof to the intent elements of torture and aggravated mayhem, that point was readily apparent from the court's instructions. Specifically, the court instructed the jury that "[w]henever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt." Later, the court instructed the jury that to prove defendant guilty of torture, "the People must prove that: [¶] . . . [¶] . . . the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." Similarly, the court instructed the jury that to prove defendant guilty of aggravated mayhem, "the People must prove that: [¶] . . . [¶] . . . when the defendant acted he had the specific intent to permanently disable or disfigure the other person." In large part, defendant's proposed pinpoint instruction would have been simply duplicative of these other instructions.

Additionally, to the extent defendant's proposed pinpoint instruction would have specifically directed the jury's attention to his "cultural variance" evidence, the instruction constitutes an improper comment on the evidence. " 'An instruction should contain a principle of law applicable to the case, expressed in plain language, indicating no opinion of the court as to any fact in issue.' " (*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [248 Cal.Rptr. 600, 755 P.2d 1049].) " '[I]t is not a matter of law for the judge to say that certain

evidence might give rise to a reasonable doubt as to the affirmative of an issue required to be proven by the prosecution. That is a comment on the evidence and any such comment should be identified as such.' " (*Id.* at p. 1136.)

Under these principles, the proposed instruction's statements that "[y]ou may take this [cultural variance] evidence into consideration when determining [defendant]'s intent," that "the defendant is entitled to an acquittal if you have a reasonable doubt as to the defendant's guilt based on the cultural variance evidence presented," and that "[s]uch evidence may itself leave you with a reasonable doubt" are all erroneous for the reason stated in *Wright*: they are comments on the evidence, masquerading as statements of law. Such comments have no place in a jury instruction. (*People v. Wright, supra*, 45 Cal.3d at p. 1136.)

Defendant contends he was entitled to an instruction to direct the jury's attention to evidence from which a reasonable doubt of his guilt could be inferred. (*People v. Jeffers* (1996) 41 Cal.App.4th 917, 924–925 [49 Cal.Rptr.2d 86].) The instruction he now contends would have been appropriate, however, is not the sort of instruction authorized by *Jeffers* (and related cases). For example, in *Jeffers* the instruction that would have properly directed the jury's attention to evidence from which a reasonable doubt of the defendant's guilt could be inferred stated in general terms as follows: " 'When an ex-felon comes into possession of a firearm, without knowing that he has a firearm, and he later learns that he has a firearm, he does not automatically violate Penal Code section 12021(a) upon acquiring knowledge. [¶] The ex-felon violates the law only if he continues to possess the firearm for an unreasonable time, without taking steps to rid himself of the firearm.' " (*Jeffers*, at p. 924.) Thus, the instruction in *Jeffers* was a correct and general statement of the law that pinpointed the defendant's theory of the case without referring to the specific evidence introduced on that theory and without commenting on that evidence. The "cultural defense" instruction defendant now contends his attorney should have requested was entirely different. Defendant was not entitled to such an instruction under the rule from *Jeffers*.

### III

*Section 654*

Defendant contends the trial court erred by failing to stay his sentence under section 654 for *either* count 1 (torture) *or* count 2 (aggravated

mayhem), *and* by failing to stay his sentence on counts 5, 6 and 7 (infliction of corporal injury on Y.).[3] Neither claim has merit.

■ Section 654 precludes multiple punishments for a single act or indivisible course of conduct. (E.g., *People v. Coleman* (1989) 48 Cal.3d 112, 162 [255 Cal.Rptr. 813, 768 P.2d 32].) " 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced.' " (*People v. Coleman, supra*, 48 Cal.3d at p. 162; see *People v. Latimer* (1993) 5 Cal.4th 1203, 1208 [23 Cal.Rptr.2d 144, 858 P.2d 611].)

Defendant first contends that because "[t]he prosecution . . . charged . . . aggravated mayhem, as a continuous conduct crime, alleging the same time period as that charged [for the torture count]," it "would constitute double punishment" "[t]o punish [defendant twice] for the same continuous course of conduct."

The flaw in this argument is that the application of section 654 does not depend on the *allegations* of the charging instrument, but on what was *proven* at trial. Here, the People argue that "[t]he evidence offered at trial established multiple acts that satisfied the legal requirements of both torture and aggravated mayhem such as, the knife burning incident and the three separate beatings that occurred on September 9 and 10, 2007. Thus, the jury, which was given a unanimity instruction and was further instructed to 'consider each count separately and return a separate verdict for each one,' had multiple incidents to choose from in reaching its guilty verdicts for both counts." Defendant does not dispute the truth of this assertion. Thus, it follows the trial court—like the jury—reasonably could have concluded the torture and aggravated mayhem counts were not based on the same conduct or course of conduct, and therefore the trial court did not err in refusing to stay the sentence on one or the other of those counts.

Defendant next argues that "a defendant cannot be separately punished both for a continuous course of conduct and for discrete acts included in that course of conduct," and therefore he cannot be punished for inflicting

---

[3] Defendant's identical contention as to count 8 is moot since he was acquitted of that count.

corporal injury on Y., as charged in counts 5, 6, and 7, in addition to being punished for torturing Y., because the "torture, was alleged as a continuous conduct offense that occurred on or about 2004 through September 10, 2007," and "[t]he corporal injury acts charged in counts 5, 6, [and] 7" "were alleged as occurring in 2005 (count 5), July 2007 (count 6), [and] 2007 (count 7)."

As with the previous argument, the flaw here is that the application of section 654 does not depend on the *allegations* of the charging instrument, but on what was *proven* at trial. The verdict forms the jury returned show that the jury found defendant guilty of count 5 based on an incident in or about 2005 when defendant hit Y. on the head, of count 6 based on an incident in or about July 2007 when defendant punched Y., and of count 7 based on an incident in or about 2007 when defendant bit Y.'s fingers. In light of this, for defendant's section 654 argument to succeed he would have to show that these discrete incidents were part of the course of conduct on which the torture conviction was based. He has not done so. In the absence of such showing, we cannot conclude that the trial court erred in imposing separate punishment on these three counts of inflicting corporal injury on Y. and the single count of torturing Y.

## DISPOSITION

The judgment is affirmed.

Nicholson, Acting P. J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied November 10, 2010, and appellant's petition for review by the Supreme Court was denied January 19, 2011, S188396. Cantil-Sakauye, C. J., did not participate therein.