Filed 12/17/14  P. v. Limon CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

| | |
|---|---|
| THE PEOPLE, | C071544 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F9306) |
| v. | |
| RACHEL ANN LIMON, | |
| Defendant and Appellant. | |

Defendant Rachel Ann Limon was found guilty of torture, aggravated mayhem, and child abuse likely to cause great bodily injury.  The jury found true an allegation that defendant personally inflicted great bodily injury.  The jury found defendant not guilty of attempted murder and attempted voluntary manslaughter.  The victim was a seven-year-old boy for whom defendant was the legal guardian.  The trial court sentenced defendant to an aggregate prison term of 23 years to life, consisting of the upper term of six years for child abuse likely to cause great bodily injury plus three years for the great bodily injury enhancement, and consecutive terms of seven years to life for the torture and aggravated mayhem counts.

1

Defendant argues her conviction should be reversed because of juror misconduct, instructional error, and insufficient evidence to support the aggravated mayhem conviction. She argues her sentences for child abuse and aggravated mayhem should have been stayed pursuant to Penal Code section 654,[1] and that the trial court improperly sentenced her to seven years to life on each of the torture and aggravated mayhem charges, rather than simply sentencing her to life with the possibility of parole on those counts. Finally, she argues her trial counsel was ineffective for failing to request the trial court to consider her mental illness as a mitigating factor in sentencing.

We find no error and shall affirm the judgment in full.

FACTUAL AND PROCEDURAL BACKGROUND

J., the victim, was born in 2002 to Melissa Radford and Javier Lopez. Radford lost custody of J. when she was incarcerated. J. eventually went to live with Lopez and defendant, who was Lopez's girlfriend. This occurred in April or May of 2008. In mid-2008, defendant obtained legal custody of J. Defendant and Radford, who was out of custody by this time, constantly fought over J.

In early December 2009, J.'s school bus driver became concerned when J. stopped riding the bus. On December 3, 2009, J. was absent from school without an excuse. The next day, defendant called the school and reported that J. was sick. On December 7, a Monday, J. was still not in school, and defendant told the school secretary that she was unenrolling J. because he was going to be moving to live with defendant's mother, since J.'s biological mother (Radford) was causing so much trouble. J. never went back to school.

On December 11, sheriff's deputies Nathaniel Benton and David Peery went with children and family services worker Laurie Schaller to do a welfare check on the victim.

---

[1] Further references to a statute are to the Penal Code.

2

They went to an address on Rhonda Road, which was the residence of defendant's mother. After initially being told by defendant's brother that there were no children in the house, the three eventually received permission to enter. They discovered the victim lying on a mattress in a bedroom. He was having difficulty breathing, appeared to be in extreme pain, and could not move.

When the paramedics arrived, they cut off the victim's clothes to check for injuries. There were bruises all the way around J.'s neck and covering his entire torso. His nipples appeared to be burned. He had more bruising and abrasions on his legs.

Defendant arrived at the house approximately 20 minutes after J. was taken away in an ambulance. Detective Brian Jackson interviewed defendant after she was transported to the sheriff's office. A video of the interview was played for the jury. On the video, defendant admitted she was depressed, and that she wanted to kill herself. She said she injured J., " 'Cause I took everything out on him because of his mom." She said she threw him and grabbed him and hit him with her hands.

J. was transported by ambulance to the Mercy Redding emergency room. After he was stabilized, he was air-lifted to UC Davis Medical Center. When he arrived at UC Davis, he was on a ventilator and he had a tube inserted into his right chest to evacuate blood out of his chest. He had 13 rib fractures of such severity that the ribs could no longer provide adequate support for his lungs to work very well. The rib fractures on his right side were fresh. He had injuries to his liver and spleen. He had fractures of both forearms, as well as new and older fractures in his left chest. The left forearm fracture was older, but the right forearm fracture was fresh. The older left rib fractures were from two to six weeks old. Two of his thoracic vertebrae were fractured. The vertebrae fractures were recent.

There were abrasions on J.'s head and bruising on his face and chest. He had bruising on his abdomen, back, and pubic area. One leg, foot, and hand were bruised. His left ear was a cauliflower ear, which is caused by injury to the ear resulting in

3

bleeding and scarring within the ear. J. had internal bleeding and his lung was torn and bruised. In addition to the bruising on J.'s chest, the skin had come off around his nipples. The wounds were fresh. His physicians were unsure whether the wounds were caused by abrasion or a chemical burn. J.'s injuries were considered life threatening. One of his treating physicians opined that the injuries were the result of physical abuse.

Defendant testified in her own defense. She had lived with Lopez, J.'s father. When J. came to live with them, she had two other children of her own. Defendant applied to become J.'s legal guardian because child protective services would not allow Lopez to have custody of J. While J. lived with them, his mother, Radford, constantly came and took him away and threatened defendant. Radford frightened her, and she was depressed because she was constantly having to change residences to get away from Radford.

In November 2009, Lopez purchased two four-wheelers for the children. On approximately December 6, J. had an accident on one of the four-wheelers. He flipped the vehicle and it fell on top of him. He got up afterward, and only had some scratches. She claimed Radford had picked up J. earlier in the week (before defendant was arrested) and kept him a half-day. She noticed the injuries to J.'s nipples the day after he had been with Radford.

As to the confession that had been obtained from her during interrogation, defendant claimed she was on medication for depression, was hallucinating, and was not thinking clearly. She lied when she admitted throwing and striking J. She had just been trying to make the officers happy, thinking that if she did, they would leave her children alone.

DISCUSSION

I

No Prejudicial Juror Misconduct

Defendant claims the judgment should be reversed because the misconduct and bias of Juror No. 1 violated her right to due process, her right to a fair trial by an impartial jury, her right to confront witnesses under the Sixth Amendment, and her right to a jury trial under the California Constitution.  We shall conclude there is no reasonable probability of prejudice from any misconduct.

A.  Additional Facts Relevant to This Issue

Prior to opening statements in the case, the court informed the parties that he received the following message from his judicial assistant:

> ". . . I just received a call regarding juror misconduct in the Limon case. The juror is [Juror No. 1].  She has been openly discuss[ing] this case at her workplace and everyone working with her knows which trial she is seated on.  The caller wishes to remain confidential if at all possible due to the fact that he is a coworker in her direct line of authority and does not want his reporting of her conduct to interfere with his workplace."

Juror No. 1 was called into the courtroom and shown the message.  In response to the trial court's offer that she give her reaction to the message, she replied:

> "The only discussion at my work is I did tell them that I was going to be on trial for the next most likely six weeks.  And they -- I told them I couldn't discuss what trial I was on.  The people that I work with presumed that it was this trial because that was the one that the media said was being selected that day.  But I didn't discuss any details of the case.

The court asked if she had ever discussed the details of the case with anyone, and she stated she had not.  She stated that one of the women at work said she was sure it was going to be an interesting case, and that she could not wait for the end of the six weeks so they could discuss it.  She stated she had not confirmed that she was on the Limon case.

The court and parties agreed to proceed with the trial while the bailiff contacted the anonymous caller.  The bailiff reported that he contacted the juror's supervisor, who

5

reported that before a jury panel had been picked, he overheard someone ask Juror No. 1 if she were on the jury, and she replied "yes, I'm on the Rachel Limon case . . . the one who beat the child -- or the kid." The supervisor indicated that other employees told him she had talked about the case, but there were no specifics. The supervisor indicated twice previously he had spoken to Juror No. 1 about divulging confidential information pertaining to their work in a public place.

After discussing this information, the parties and the court agreed that the bailiff should investigate the matter further. The bailiff reported back that he had spoken with three employees who worked near Juror No. 1. The first employee stated that during jury voir dire, she received a text from Juror No. 1 stating that she was sitting on the Rachel Limon case. Juror No. 1 texted her again that she did not believe she would be chosen because she had three children of her own. Later, Juror No. 1 talked about the jury selection process, and told her they had released 35 people from the jury pool. Still later, Juror No. 1 told her or someone near her that the jury had been selected and that she had been released for the day.

The second employee said she saw the text sent to the first employee and asked Juror No. 1 if she would be able to discuss the case after it was concluded.

The third employee never heard Juror No. 1 talk about the case except to say she could not read or watch any news about the case.

The trial court found that while Juror No. 1 may have technically violated its admonitions, her conduct did not rise to such a level that she should be removed from the jury. Both counsel agreed with this assessment.

B. Discussion

We are guided by well established legal principles when reviewing a claim of juror misconduct. A defendant has a constitutional right to trial by an unbiased jury, which right may be violated if even a single juror is biased. (U.S. Const., 6th & 14th Amends.; Cal.Const., art. I, § 16; *In re Hitchings* (1993) 6 Cal.4th 97, 110; *People v.*

6

*Nesler* (1997) 16 Cal.4th 561, 578.)  Juror misconduct "usually" raises a rebuttable presumption of prejudice and may establish juror bias.  (*In re Hamilton* (1999) 20 Cal.4th 273, 295-296.)  "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant."  (*Id*. at p. 296.)

Defendant argues Juror No. 1 committed misconduct when she violated the trial court's order not to discuss the case with anyone, and when she prejudged the case.  This latter claim is based on Juror No. 1's comments to her coworker that she was on the case of the woman who beat the child.

A direct violation of the admonitions of the trial court, such as discussing the case with a nonjuror, is juror misconduct.  (*In re Hamilton, supra,* 20 Cal.4th at p. 294.)  However, the reason admonitions to refrain from discussing the case with a nonjuror are given is to prevent the risk that a juror will gain information about the case that is not presented at the trial.  (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1201.)  Where a juror has a conversation involving only peripheral matters, such conversations are generally regarded as nonprejudicial.  (*Id*. at pp. 1201-1202.)  That is the case here.  Juror No. 1 neither gave nor received any information regarding the substance of the case.  Thus, the record and the circumstances surrounding the misconduct indicate there is no substantial likelihood one or more jurors were actually biased against defendant because of Juror No. 1's actions.

Defendant argues Juror No. 1's comments indicate she prejudged the case when she told a coworker she was on the case of "the one who beat the child -- or the kid."  We disagree this statement indicates Juror No. 1 prejudged the case.  Juror No. 1's comments were more likely an attempt to identify the case, which had some notoriety, rather than to

indicate she had already found defendant guilty.[2] We cannot fault a lay person for omitting to tell someone defendant was merely *alleged* to have beaten the child.

## II
## No Ineffective Assistance of Counsel

Defendant also argues that her trial counsel's performance was below an objective standard of reasonableness because he never made a motion to discharge Juror No. 1. No ineffective assistance of counsel has been established on this record.

To prevail on this claim, defendant must show that the performance of her trial counsel was deficient and that she was prejudiced thereby. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) The defendant has the burden of affirmatively showing error by a preponderance of the evidence. (*Id*. at pp. 217-218)

The trial court has the discretion to dismiss a juror upon a determination of good cause. (§ 1089; *People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484.) The juror's inability to perform must appear in the record as a " 'demonstrable reality' " and the court may not presume bias. (*Thomas,* at p. 1484.)

The evidence here, that Juror No. 1 referred to the case as the one in which defendant beat up the child, was insufficient to show juror bias. As indicated, it was more likely a statement intended to identify the case, rather than to indicate a prejudgment of defendant. Defense counsel agreed with the trial court's conclusion that Juror No. 1 did not need to be removed from the jury. Because there was no evidence Juror No. 1 received any prejudicial information in her discussions with nonjurors, and she gave only peripheral, nonsubstantive information in those discussions, there was no reasonable probability of prejudice. It is therefore extremely unlikely that the trial court would have dismissed Juror No. 1 had defense counsel moved to have her dismissed.

---

[2] Several media requests in the transcript indicate the case was in the local news.

8

Counsel is not ineffective for failing to raise a futile or frivolous motion. (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

III
Instructional Error

Defendant argues that the trial court erred in giving the standard motive instruction (CALCRIM No. 370) in conjunction with the standard torture instruction (CALCRIM No. 810) because it informed the jury it did not have to find defendant had a specific intent to commit torture. We reject the argument, as it is not error to give the standard motive instruction in these circumstances.

The instructions in question were as follows:

> "The people are not required to prove that the defendant had a motive to commit any of the crimes charged. In reaching your verdict, you may, however, consider whether the defendant had a motive. Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

> "The defendant is charged in count two with torture in violation of Penal Code Section 206. To prove that the defendant is guilty of this crime, the people must prove that: One, the defendant inflicted great bodily injury on someone else; and two, when inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."

Defendant claims the motive instruction told the jury the state was not required to prove she had a motive to commit the crimes charged, while the torture instruction informed the jury it must find she "intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." She claims the two instructions together "improperly lowered the state's burden on the specific intent element of the torture offense, because they essentially equated motive with intent and led the jury to believe motive is interchangeable with intent." Defendant claims the prosecutor's closing arguments exacerbated the jury's confusion.

9

A.  The Instructions Were Not Erroneous

Defendant cites *People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126-1127, which held the trial court erred in giving the motive instruction together with the instruction on annoying or molesting a child, which includes the element that the proscribed act must be "motivated by an unnatural or abnormal sexual interest in children . . . ."  (§ 647.6, subd. (a)(2).)  *People v. Maurer* is distinguishable from this case because motive was an element of the crime of molesting a child, which was the crime at issue in *Maurer*, but is not an element of the crime at issue here, torture.  (See *People v. Wilson* (2008) 43 Cal.4th 1, 22.)

Here, the instruction given on torture used the term "intent[ion]" and "purpose," not motive or motivation.  There was no instruction here telling the jury that motive or motivation was an element of torture.  There was no instruction that interchanged motive and intent.  As a result, there is no reasonable likelihood the jury would have heard the two instructions and believed it did not have to find defendant intended to cause cruel or extreme pain, or that it did not have to find defendant inflicted such pain for the purpose of revenge, persuasion, or a sadistic purpose.  Where the instructions did not use the terms motive and intent interchangeably and there is no reasonable likelihood the jury would have understood the terms to be synonymous, there is no error in giving the motive instruction.  (*People v. Cash* (2002) 28 Cal.4th 703, 739.)

B.  The Prosecutor's Statements Were Not Error

As indicated, defendant argues the prosecutor's arguments to the jury equating intent and motive reinforced the jury's understanding that in order to find her guilty of torture it was not required to find she had the specific purpose of revenge, extortion, persuasion, or any sadistic purpose when inflicted injury on J.  We conclude there is no reasonable likelihood the jury would have understood the prosecutor's arguments to mean it was not necessary to find defendant inflicted injury on J. without also finding it was for the purpose of revenge, extortion, persuasion, or any sadistic purpose.

10

The prosecutor clearly told the jury that torture had two elements:

"The crime of torture has two elements, [t]he first being that the defendant inflicted great bodily injury on someone else. And secondly, that when the person was inflicting this injury, she intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or any other sadistic purposes. And for our purposes here, the purpose was for revenge. It wasn't for extortion. It wasn't for persuasion. It wasn't for anything else."

After reviewing the evidence that defendant inflicted great bodily injury on J., the prosecutor continued:

"So for the first element of torture, we have satisfied that she personally inflicted, or that she inflicted great bodily injury on [J]. That takes us to the second element. The second element has to do with the motivation behind that infliction of injury. When she inflicted this injury did she intend to cause pain and suffering for the purposes of revenge? Absolutely."

Elsewhere in his closing argument, the prosecutor argued defendant's motive was her hatred of J. and her desire for revenge against his mother.

"She is guilty [of all the charges] based upon her express motive for wanting to hurt the child."

"The evidence shows that she had the intent to kill. But ladies and gentlemen, that's not the only evidence we have of her intent to kill. We have to look at her motive. She hated [J.], not because of who he was, but because of who he represented: Melissa Radford."

"Think about her motive. Think about her hatred. Think about her revenge that she was seeking against Melissa Radford. In that context, we have her pulling, twisting on this ear, causing extreme indifference to a child's physical or psychological well-being. That is the crime of aggravated mayhem"

". . . Detective Jackson asks, why is he injured? How did those injuries happen?

"Her answer: Because I took everything out on him because of his mom. She's giving you her motive. She's giving you her reason. It's revenge, pure and simple."

11

Defendant's argument is that the prosecutor's comments equated revenge with motive, and since revenge was an element of the offense of torture under the fact of this case, the jury could have concluded it was not required to find she hurt J. for the purpose of revenge. We disagree for three reasons.

First, in only one of the above statements did the prosecutor indicate that revenge was the *motive* behind the torture. This was when the prosecutor stated that the second element of torture was concerning the "motivation" behind the infliction of the injury. Every other time the prosecutor used the word "motive," he argued the motive was either hatred, or wanting to hurt J. The prosecutor told the jury that defendant had indicated that her motive and reason for the beating was revenge, but this statement was not directed at the motive for the crime torture, per se, but merely at the motive for the acts generally.

Second, four of the above statements were not comments on the crime of torture at all, but instead were arguments relating to mayhem, attempted murder, or defendant's guilt generally of all the charges.

Finally, the first two comments by the prosecutor made it clear that one of the elements of the crime of torture was that the defendant beat J. for the purpose of revenge. There is no reasonable probability that the jury would have believed it was not required to find something that the prosecutor specifically indicated was an element of the crime. Couple this with the fact that the jury was instructed to disregard any part of the attorneys' argument that conflicted with the court's instructions, and we conclude the prosecutor's arguments did not render the jury instructions confusing.

Because we addressed the merits of defendant's instructional argument, we need not consider her claim that her trial counsel was ineffective for not requesting a clarifying instruction.

12

## IV
## Unanimity Instruction

Defendant was convicted of aggravated mayhem based upon the infliction of J.'s cauliflower ear. A defendant is guilty of aggravated mayhem if she: "under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body." (§ 205.)

The prosecution's expert testified cauliflower ear is caused when bleeding within the ear over time begins to scar, resulting in disfigurement. In the case of children who have been abused, the injury is typically caused by a blow to the side of the head or the ear being forcibly pulled or pinched. It usually results from repeated injury, although it is possible a single event could cause it if the blow were forceful enough to cause a significant amount of bleeding. Once the cauliflower ear has developed, it is a permanent condition.

As part of her defense, defendant submitted evidence J. was treated for a swollen ear in 2008, approximately a year before defendant was arrested in this case. J.'s medical records indicated he was treated for bleeding, infection, and recurrent swelling in the ear, and that he was still having deformity. The ear was aspirated, and by the last visit the assessment was that it had "much improved."

Defendant argues a unanimity instruction was required because the evidence suggested more than one discrete crime of mayhem, and the prosecution must either elect between the crimes, or the court must give a unanimity instruction. Specifically, defendant argues the mayhem charge could have been based on J.'s 2008 ear injuries, as evidenced by his medical records.

The jury must unanimously agree that a defendant is guilty of a specific crime. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Therefore, cases have long held that

13

when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act." (*Ibid*.) The requirement of unanimity " 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' [Citation.]" (*Ibid*.)

As indicated, no unanimity instruction is required where the prosecution makes an election between the crimes. In this case, that election was made in the information and in the prosecutor's closing arguments. On the charge of aggravated mayhem, the information alleged that defendant, "[o]n or about the 11th day of December, 2009, did willfully and unlawfully . . . intentionally cause permanent disability and disfigurement . . . of J. . . . ."

Defendant argues it is immaterial what is charged, as long as the evidence tends to show the commission of more than one act. Defendant misses the point. The need for a unanimity instruction arises when the evidence describes more than one act, and any one of the acts described by the evidence *could constitute the charged crime*. (See *People v. Gordon* (1985) 165 Cal.App.3d 839, 853, disapproved on another point in *People v. Frazer* (1999) 21 Cal.4th 737, 765, itself overruled on other grounds by *Stogner v. California* (2003) 539 U.S. 607 [156 L.Ed.2d 544].) Here, because the information charged that the crime occurred on or about December 11, 2009, the evidence that J.'s ear was injured in 2008 could not have constituted the charged crime.

The 2008 evidence was introduced by defendant herself in an attempt to show that her beating of J. in 2009 did not cause the cauliflower ear. The prosecutor's closing argument attempted to discount the 2008 evidence, and to show that the ear disfigurement occurred over time, but resulted in the cauliflower ear in December 2009. He argued:

> "What about the ear that counsel talked about and he sought to introduce
> evidence of doctors visits back in October of 2008? The child's ear was
> injured in October of 2008. He had medical treatment for it. But there was
> a cauliflower ear that had developed as of December 11, 2009. And as I

14

argued to you a while ago, it is a totally reasonable inference that that cauliflower ear had continued to deteriorate and get worse as a result of the defendant's abuse of [J].

". . . There are scrapes and scratches to that ear that are more recent than October of 2008. That ear was still the focus of some attention, negative attention, up and to November and December of 2009."

Moreover, there was no evidence that defendant caused the ear problem in 2008, or indeed what caused the ear problem in 2008. As the prosecutor argued, to obtain a conviction for mayhem, the People must prove not only that the victim was disfigured permanently, but that the defendant committed the crime. As there was no evidence defendant caused J.'s ear problems in 2008, there was no act in 2008 that could have constituted the charged crime of mayhem. There was no need for a unanimity instruction, and the trial court did not err in failing to give one. This being the case, we need not address defendant's additional argument that her trial counsel was ineffective because he forfeited a unanimity instruction for mayhem when he agreed there was no need for a unanimity instruction for the child abuse charge.

V

Sufficient Evidence to Support Aggravated Mayhem

Defendant argues her conviction for aggravated mayhem must be reversed because there was insufficient evidence she intended to maim J. The argument has no merit.

Defendant argues that in this case J.'s injuries were indiscriminate. She argues J. suffered multiple injuries, and that these may have been caused by the same blunt-force trauma that caused the cauliflower ear. In effect, she argues there is no evidence she targeted J.'s ear.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶]

15

While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the prosecution, and must presume every fact the jury could reasonably have deduced from the evidence." (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)

Aggravated mayhem requires the specific intent to maim, i.e., to cause a permanent disability or disfigurement. (*People v. Assad* (2010) 189 Cal.App.4th 187, 195.) A defendant's specific intent to maim may not be evidenced solely by the fact that the injury inflicted constitutes mayhem. Facts and circumstances other than the fact of the maiming must support an inference of intent to maim, rather than an indiscriminate attack. (*People v. Ferrell* (1990) 218 Cal.App.3d 828, 835.) Such facts and circumstances include the circumstances attending the act, the manner in which it is done, and the means used. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 831.)

The intent to maim is shown in this case, not by the injury itself, but by the way the injury is typically caused, as explained by the prosecution's expert. The expert testified that while it is possible for a cauliflower ear to result from a single traumatic incident, it is typically the result of repeated blows, pulling, or pinching of the ear. The cauliflower ear develops "over time" as bleeding within the ear begins to scar. The expert also testified that he had seen children develop a cauliflower ear within a month or two after a traumatic injury, but that once the "cauliflower" developed, it was impossible to say how long the ear had been in that condition. The expert testified that the abrasions on J.'s ear were "more recent injuries . . . ." We assume in this context he meant the abrasions were more recent than the cauliflower ear.

"A jury may infer a defendant's specific intent from the circumstances attending the act, the manner in which it is done, and the means used, among other factors." (*People v. Ferrell, supra*, 218 Cal.App.3d at p. 834.) The evidence that a cauliflower ear is typically the result of repeated injuries to the ear, that it develops over time following an assault to the ear, and that J.'s ear exhibited abrasions that were more recent than the

16

development of the cauliflower ear, were sufficient to support a reasonable inference by the jury that defendant had targeted J.'s left ear for some time, and that the cauliflower ear did not just appear as a result of her most recent indiscriminate attack on J. Such repeated targeting of the left ear is sufficient evidence from which to infer a specific intent to permanently disfigure the ear.

## VI
## Section 654

The trial court sentenced defendant to a seven-year-to-life term for torture, a consecutive seven-year-to-life term for aggravated mayhem, and a consecutive term of six years for child abuse plus three years for the great bodily injury allegation. Defendant argues that pursuant to section 654, the sentences for aggravated mayhem and child abuse should have been stayed.[3] She argues the sentence for child abuse was based on the same course of conduct as the torture offense, and that the aggravated mayhem conviction was based on an individual act which was part of the same continuous course of conduct on which the torture and child abuse counts were based.

The purpose of section 654 " 'is to insure that a defendant's punishment will be commensurate with his culpability.' [Citation.]" (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.) Courts have interpreted the statute to preclude multiple punishment not only for a single act that is punishable under more than one statute, but also for an indivisible course of conduct punishable under more than one statute. (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) "Whether a course of conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the 'intent and objective' of the actor. [Citation.] If all of the offenses are incident to one

---

**3** As relevant, section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

objective, the court may punish the defendant for any one of the offenses, but not more than one. [Citation.] If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct. [Citation.]" (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.)

Finally, "where a course of conduct is divisible in time it may give rise to multiple punishment even if the acts are directive to one objective. [Citation.] If the separation in time afforded defendants an opportunity to reflect and to renew their intent before committing the next crime, a new and separate crime is committed. [Citation.]" (*People v. Louie* (2012) 203 Cal.App.4th 388, 399.) Thus, in determining whether a course of conduct is indivisible, we look not only to the intent and objective of the actor, but to whether the course of conduct is indivisible in time. (*People v. Beamon* (1973) 8 Cal.3d 625, 637-639.)

Whether the defendant had a single intent and objective within the meaning of section 654 is a question of fact for the trial court, which is given broad latitude in making the determination. (*People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5; *People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) The trial court's findings must be upheld on appeal if there is any substantial evidence to support them. (*Hutchins,* at p. 1312.)

The trial court made the following findings in deciding not to apply section 654:

> "On a question of whether any sentences should be stayed under 654, in my view and based on the medical and other testimony at trial, each of the offenses is a separate and distinct offense with a separate criminal intent, each of which occurred at a different time and under different circumstances, employing different means, and resulting in separate and distinct injuries to the victim.
>
> "Specifically there was evidence of rib fractures and other injuries to the victim that were distinctly older than fractures that occurred nearer to the actual discovery of the crimes. These older fractures are indicative of a

18

much more systematic and prolonged pattern of child abuse and are deserving of a separate punishment. The injuries which are proximate to when these crimes [occurred] indicate a separate and independent and explosive course of conduct of abuse amounting to torture, which is deserving of separate punishment.

"The burns on [J.]'s chest, the fresh or displaced rib fractures, the internal injuries and other broken bones, abrasions, and bruises, all reveal a condensed period of abuse in which the defendant's cruelty rose to the level of torture independent of the earlier abuse, and thus the torture and child abuse charges are deserving of separate criminal penalty. Just as the permanently disfiguring repeated and malicious traumatic injuries to [J.]'s ear is deserving of a separate punishment.

"In other words, in my view, none of these crimes are instances of the same conduct merely charged in different ways."

We agree with the trial court that the circumstances of this case show independent crimes deserving of separate criminal penalties. J.'s injuries evidenced both older injuries and more recent ones. J. had fresh rib fractures, as well as partially healed rib fractures. Both of J.'s forearms were fractured, and one fracture appeared older. There was evidence that the cauliflower ear, on which the mayhem charge was based, itself would have been the result of repeated injury over time. The same cauliflower ear showed both old and new injuries. Defendant herself admitted she threw and punched J. all day, "[i]t was an all day thing." Even if defendant harbored a single objective and intent in the numerous inflictions of injury on J.'s body, the physical evidence indicated many individual instances of inflicting injury at different times, not one course of conduct that was indivisible in time. The trial court did not err in imposing separate sentences.

## VII
### Seven Years to Life Sentence was Proper

The trial court sentenced defendant on count 2 (torture) to seven years to life, and on count 3 (aggravated mayhem) to a consecutive term of seven years to life. Torture is punishable by a prison term of life. (§ 206.1.) Aggravated mayhem is also punishable by

a prison term of life with the possibility of parole. (§ 205.) As is relevant, section 3046 provides that a prisoner sentenced to a life sentence may not be paroled until she has served a term of at least seven years. These statutes form the basis of the court's sentence on counts 2 and 3.

Defendant argues that the sentence, which provides in the abstract of judgment that defendant is sentenced for seven years to life on count 2 and seven years to life on count 3, violates section 1168, subdivision (b), which states in pertinent part that "the court imposing the sentence shall not fix the term or duration of the period of imprisonment." Defendant claims that by specifying the minimum parole eligibility term, the trial court was fixing the duration of the period of imprisonment. We disagree.

The Legislature has defined the duration of the period of imprisonment for these crimes. Because a defendant must serve at least seven years before being paroled, the legislatively defined term is seven years to life. The trial court does not err by specifying the minimum parole eligibility in its pronouncement of sentence. The Supreme Court has agreed, stating: "By including the minimum term of imprisonment in its sentence, a trial court gives guidance to the Board of Prison Terms regarding the appropriate minimum term to apply, and it informs victims attending the sentencing hearing of the minimum period the defendant will have to serve before becoming eligible for parole." (*People v. Jefferson* (1999) 21 Cal.4th 86, 101, fn. 3.) There was no error.

VIII
No Ineffective Assistance of Counsel

Defendant argues her trial counsel was ineffective for failing to argue during the sentencing hearing that her mental health condition was a mitigating factor.

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant

20

demonstrates prejudice, i.e., that, ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

The record contains five psychological evaluations of defendant, two of which were addressed to the judge who sentenced her. The judge sat through the trial and heard evidence that defendant was taking medication for anxiety and depression, suffered from chronic, untreated posttraumatic stress disorder, and suffered from postpartum depression. The trial court further indicated it considered defendant's mental condition in determining her eligibility for probation. In short, defense counsel may not have pointed out defendant's mental health problems at sentencing because he knew the trial court was well aware of those issues, and nothing was to be gained by reminding the court.

Moreover, there is no reasonable probability the outcome would have been different had defense counsel raised the mental health issue in light of the multiple aggravating factors cited by the court. Accordingly, we will not remand for resentencing on defendant's ineffective assistance of counsel claim.[4]

## DISPOSITION

The judgment is affirmed.

    BLEASE           , Acting P. J.

I concur:

    HULL           , J.

---

[4] As we find no error, we reject defendant's cumulative error argument.

21

MURRAY, J., concurring:

I concur with the majority opinion. I write separately to emphasize the potential for jury confusion when CALCRIM No. 370 is given in a torture case. A reasonable jury could confuse the instruction that motive is not an element of the offense with the "for the purpose of" revenge or persuasion component of the mens rea element in the torture instruction, CALCRIM No. 810. In considering the potential for juror confusion on this issue, an observation this court made in *People v. Maurer* (1995) 32 Cal.App.4th 1121 should be noted here. "We must bear in mind that the audience for these instructions is not a room of law professors deciphering legal abstractions, but a room of lay jurors reading conflicting terms." (*Maurer*, at p. 1127.) Thus, the potential for confusion should be looked at from the perspective of laypersons sitting as jurors, not from the perspective of lawyers and judges who are trained to understand the nuances of mens rea elements.

As our high court has observed, "[m]otive describes the reason a person chooses to commit a crime." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) Similarly, Witkin defines motive as "the emotional urge that induces a particular act," and in doing so, cites *revenge* as an example of a motive. (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Elements, § 4, p. 263.) In holding that motive is not an element of the crime of first degree murder grounded on a torture theory, the Court of Appeal in *People v. Lynn* (1984) 159 Cal.App.3d 715, actually referred to the "for the purpose" requirements as motives. That court observed that CALJIC No. 8.24, the former instruction for first degree torture murder, "*simply makes explicit the treatment of motive as an element of proof in torture murder cases* rather than as an element of the crime." (*Lynn*, at p. 728, italics added.) These authorities illustrate the potential for juror confusion of motive (i.e., the reason a person commits a crime) with the "for the purpose" revenge or persuasion element of the substantive crime of torture. Indeed, the prosecutor here even equated "for

1

the purpose of" with "motive" when he argued to the jury that the second element of torture "has to do with the *motivation behind that infliction of injury*. When she inflicted this injury did she intend to cause pain and suffering for the purposes of revenge? Absolutely." (Italics added.)

Although there is a potential for juror confusion, there was no such confusion here. The prosecutor did not argue he need not show a motive. To the contrary, he argued the evidence clearly showed the motive for the injuries defendant inflicted was revenge. Courts should look to the entire record, including the arguments of counsel, when determining whether there is a reasonable likelihood the jury misconstrued or misapplied the law in light of the instructions given. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1330; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) Here, any theoretical possibility of confusion was diminished by the prosecutor's closing argument. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189.)

While the record does not demonstrate that any juror confusion occurred here and thus there is no evidence of prejudice, I believe the cleanest way of avoiding potential confusion is to modify CALCRIM No. 370 to expressly exclude the crime of torture from the instruction that "[t]he People are not required to prove that the defendant had a motive to commit (any of the crimes/the crime) charged."


                                             MURRAY            , J.

2