Filed 6/24/22  P. v. Ruiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047959 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1881624) |
| v. | |
| EDWARD RUIZ, | |
| Defendant and Appellant. | |

A jury convicted defendant Edward Ruiz of 15 crimes arising from an April 2019 escape from custody and four incidents that occurred in January 2018.  The trial court sentenced Ruiz to 22 years in prison.

On appeal, Ruiz raises eight claims of error.  Stated broadly, he challenges the sufficiency of the evidence for an assault with a firearm conviction, the effectiveness of his trial counsel related to that conviction, various aspects of his sentence and an imposed fee (including under recently enacted statutory changes), and the correctness of the abstract of judgment.

For the reasons explained below, we reverse the conviction for assault with a firearm (count 2), vacate Ruiz's sentence entirely, and remand the matter for full resentencing with directions.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

On September 24, 2019, during trial, the Santa Clara County District Attorney filed a third amended information (information) charging Ruiz with 18 crimes: First degree burglary (Pen. Code, § 460, subd. (a);[1] count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), first degree robbery (§ 212.5, subd. (a); count 3), battery causing serious bodily injury (§ 243, subd. (d); count 4), felony false imprisonment (§ 236; count 5), two counts of carjacking (§ 215, subd. (a); counts 6 & 8), second degree robbery (§ 212.5, subd. (c); count 7), attempted second degree robbery (§§ 664, 212.5, subd. (c); count 9), taking or unauthorized use of a vehicle with intent to temporarily deprive the owner of title and possession (Veh. Code, § 10851, subd. (a); count 10), attempt to dissuade a witness or victim by use of force or threat of force (§ 136.1, subd. (c)(1); count 11), false imprisonment of a hostage (§ 210.5; count 12), two counts of misdemeanor petty theft (§ 488; counts 13 & 14), two counts of misdemeanor resisting, delaying, or obstructing an officer (§ 148, subd. (a)(1); counts 15 & 18), misdemeanor possession of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 16), and escape from the lawful custody of an officer (§ 4532, subd. (b)(1); count 17).

As to count 1, the information further alleged that Ruiz personally used a firearm (§ 12022.5, subd. (a)). As to counts 3, 4, and 5, the information alleged that Ruiz was armed with a firearm (§ 12022, subd. (a)(1)). As to counts 4 and 8, the information alleged that Ruiz personally inflicted great bodily injury (GBI) (§§ 667, 1192.7 [count 4]; §§ 12022.7, subd. (a), 1203, subd. (e)(3) [count 8]). As to count 10, the information alleged Ruiz had previously been convicted of a violation of Vehicle Code section 10851, subdivision (a) (§ 666.5, subd. (a)). Lastly, the information alleged that Ruiz had served seven prior prison terms (prison prior) (§ 667.5, subd. (b)).

---

[1] Unspecified statutory references are to the Penal Code.

A jury found Ruiz guilty of counts 2 through 13, 15, 17, and 18, and found true the allegations attached to counts 3, 4, 5, and 8.[2]  The jury found Ruiz not guilty on counts 1 (burglary) and 14 (petty theft).  The jury could not reach a unanimous verdict on count 16 (drug paraphernalia possession), which was subsequently dismissed.

In a bifurcated court trial, Ruiz admitted the truth of the prior conviction allegation attached to count 10 and the seven prison prior allegations.

In February 2020, the trial court sentenced Ruiz to an aggregate term of 22 years in prison.  The court selected count 8 (carjacking) as the principal term and imposed the upper term of nine years, consecutive to a three-year term for the attached GBI enhancement.  In addition, the court imposed the following terms for the remaining counts:  A consecutive term of one year and four months for count 3 (robbery), plus a consecutive four-month term for the attached firearm enhancement; a consecutive term of one year for count 4 (battery), plus a consecutive four-month term for the attached firearm enhancement;[3] a consecutive term of one year and eight months for count 6 (carjacking); a concurrent, three-year term for count 7 (robbery); a concurrent, three-year term for count 9 (attempted robbery); a concurrent, three-year term for count 10 (taking or unauthorized use of a vehicle); a consecutive term of three years for count 11 (witness or victim dissuasion); a consecutive term of one year and eight months for count 12 (false imprisonment); and a consecutive term of eight months for count 17 (escape).  The court stayed the punishments for count 2 (one year for assault with a firearm) and count 5 (two

---

[2] We note that the jury's true finding on the GBI allegation attached to count 4 included a reference to section 12022.7, subdivision (a)—a provision that had not been alleged for that count in the information.  Ruiz makes no argument in this court regarding the difference between the verdict and the information.

[3] The clerk's sentencing minute order indicates that the trial court struck the additional GBI enhancement ("PC 12022.7(a)") that was attached to count 4 and erroneously states the enhancement had not been proven at trial.  The court, however, did not mention on the record this GBI enhancement at the sentencing hearing, which had been found true by the jury.

years for felony false imprisonment), under section 654.  The trial court imposed concurrent 60-day jail terms on the three misdemeanor convictions (counts 13, 15, & 18).  The court ordered victim restitution and various fines and fees, including a $129.75 criminal justice administration fee to the City of San Jose (former Gov. Code, § 29550 et seq.).  Lastly, although not mentioned on the record at the sentencing hearing, according to the court clerk's minute order and abstract of judgment, the court struck the punishment for the seven prison prior enhancements.

Ruiz timely appealed.

B.  *Evidence Presented at Trial*

1.  Prosecution Evidence

In January 2018,[4] Ruiz had a relationship with a woman, Candelaria B.  Around January 12, Ruiz argued with Candelaria at her condominium in Milpitas.  Candelaria's roommate, Michael V., was there at the time.[5]  When Candelaria asked Ruiz about $20 that was missing from her purse, he "got upset" because Candelaria had "called him a thief[,] basically."  After this, each of them left the condominium.  Ruiz eventually returned in the evening with a shotgun, covered by a cloth.  Michael V. was there.  Ruiz uncovered the shotgun and leaned it against the wall in the living room.  Later, a man named Sonny arrived.  Candelaria had not returned home and, at around 1:16 a.m., Michael sent her a text message that said, " 'Dude's [*sic*] here with a gun waiting.  Don't come home.' "

According to Michael, "[t]hings changed," and Ruiz said that "somebody had to pay for whatever [Candelaria] did."  Ruiz told Michael to empty his pockets and take off his clothes.  Ruiz also asked Michael if he was working for the police.  Sonny stood

---

[4] Unless otherwise indicated, all dates were in 2018.
[5] At trial, the trial court found Candelaria B. unavailable to testify, and a redacted version of her preliminary hearing testimony was read into evidence.  Likewise, Michael V. was declared unavailable, and a redacted version of his preliminary hearing testimony was read into evidence.

4

behind Michael and pointed the shotgun at Michael's face and/or head.**6**  Michael testified that the shotgun "was behind" him, and Sonny "made some -- there was some kind of noise and he pointed it at [Michael's] head."  On cross-examination, Michael also said, "What I pay attention to is [that the] dude has his hands on the trigger, pointed to my head."  Michael "was in shock" and "afraid."  Michael took off his clothes and handed his phone and money to Ruiz.  Michael testified that he did not recall Ruiz saying anything like that he would shoot Michael.

Later, another man (who was a friend of Ruiz) came to the condominium.  The man hit Michael.  The beating caused Michael to lose consciousness and injure his face.  After the beating, Sonny and the other man left.  Ruiz tied Michael to a chair, wrote on Michael's face with a marker, colored and shaved part of Michael's hair, forced Michael to put on woman's clothing, and took pictures of him.

In the morning, Michael ran out of the condominium and jumped off the balcony.  During a subsequent call to 911, Michael told the operator that Ruiz had a "big old rifle" that he used to threaten Michael by pointing it at him, not by hitting him with it.

One day later, on the evening of January 14, Tuan H. met Ruiz at a house in San Jose to buy a fish tank that had been posted online for sale.  Ruiz said the tank was in a shed outside the house, and Tuan gave Ruiz $800.  Ruiz then exited the house but did not return.  Realizing he had been scammed, Tuan texted and left voice messages for Ruiz.  Ruiz eventually called Tuan and told Tuan to meet him at a hotel in Morgan Hill to pick up the fish tank.

At Ruiz's request, Tuan drove to the hotel accompanied by Ruiz's friend.  Tuan parked "right in front" of Ruiz's hotel room, entered the room, and asked for his money

---

**6** Michael used both "face" and "head" when describing where Sonny had pointed the shotgun.  For example, Michael testified that Sonny was "[s]tanding right behind [Michael], pointing it at [his] face," and "there's a gun in [his] face."  Michael also testified that he "had a gun at [his] head" and agreed when asked if Sonny had held the gun up to the "back of [his] head" while standing behind him.

5

back. A man who was in the room with Ruiz pulled out a knife and told Tuan to "follow directions or else [he] was going to get hurt." Ruiz told Tuan to remove his pants (which contained Tuan's wallet, car keys, and phone) and hand them over. Ruiz then left the room with a woman and drove away in Tuan's car, taking Tuan's pants and wallet. Two men stayed in the room with Tuan to ensure that he did not leave. The next morning, the men seemed "tired of the situation" and gave Tuan his phone. Tuan called his father for a ride and eventually informed the police about what had happened.

Five days later, in the early morning hours of January 19, Lucio R. was driving for Uber. He picked up Ruiz in San Jose to take him to Gilroy. On the way, Lucio mentioned that he was looking for a new job. Ruiz said he owned a cannabis business and was looking for someone to be his driver. Ruiz showed Lucio a large bag of marijuana, some pills, and clear containers and asked if Lucio would be interested in driving him around to different locations. Ruiz said Lucio could earn $1,600 to $1,700 a night. Ruiz also said that if everything went well on this occasion, he would hire Lucio to be his regular "chauffeur." Lucio agreed to drive Ruiz around on that early morning.

At their destination in Gilroy, Ruiz and Lucio waited in a shed with three other men for a woman to arrive. After the woman arrived and Ruiz had spoken to her, Lucio drove Ruiz to a nearby apartment. Ruiz eventually invited Lucio into the apartment. A man and woman were inside. Ruiz drank shots and smoked a crystal-like substance using a pipe. Lucio then drove Ruiz back to the shed. Two more men were there at this time. Ruiz smoked and drank again. Ruiz and another man forced Lucio to smoke from a pipe, but he only pretended to inhale. Lucio then told Ruiz he wanted to leave. Ruiz asked Lucio for his car keys, saying that he wanted to retrieve and put some things in Lucio's car. Instead of handing over his keys, Lucio offered to unlock the car for Ruiz. They exited the shed.

When Lucio unlocked his car, Ruiz tried to get in the driver's seat. Lucio tried to stop Ruiz from getting in the car, and Ruiz punched Lucio in the face. Lucio fell to the

6

ground, "couldn't breathe for . . . awhile," felt dizzy, and was covered in blood. He noticed a handgun in Ruiz's waistband. Lucio then got into his car and locked the doors. Lucio realized that he no longer had his phone and keys, which had been in his pocket. But he was wearing a smartwatch. Lucio turned on his watch, which prompted Ruiz and his associates to demand the watch. Ruiz repeatedly unlocked the car doors remotely using Lucio's keys. Ruiz was told by an associate about Lucio's ability to use the watch to make a call and then started banging on the car's window. Lucio eventually got out of the car, acted as if he were going to give the watch to Ruiz, and then ran away yelling for help. Ruiz said "go get him," and a man chased Lucio with a screwdriver. Lucio made it to a nearby house and the residents called 911. Lucio subsequently was treated at a hospital for his injuries. He suffered a broken and bloody nose, lacerated lip, black eye, and facial swelling.

Two days later, on January 21, police located Lucio's stolen car and Ruiz at a hotel in San Jose. Ruiz had given a ride to a woman, Veronica M., from Modesto to San Jose. Police found them locked inside a hotel room. Over the course of two days, the police attempted to get Ruiz to exit the room or let the woman leave. Eventually, the police used explosives to knock down the room's door and arrested Ruiz.

Over a year later, on April 26, 2019, Ruiz was being held as an inmate at a hospital in San Jose. While using the bathroom, Ruiz broke a window and climbed out using a rope made of bedsheets. He was apprehended shortly thereafter.

2. Defense Evidence

Ruiz testified in his own defense. Ruiz said many people knew him because he is a professional "ultimate fighter," with a social media presence. He had been at and left Candelaria B.'s condominium, but "[t]here was no 20 bucks that was involved." He denied returning to the condominium and attacking Michael V. He denied having a shotgun and noted that no shotgun had been recovered. When asked about Michael's

7

testimony at the preliminary hearing, Ruiz remembered that Michael testified that the shotgun "was racked."

Ruiz had never met Tuan H., never posted a fish tank for sale, and did not take Tuan's car. Additionally, Ruiz denied meeting, riding with, or attacking Lucio R. On cross-examination, Ruiz acknowledged that both Tuan and Lucio had his phone number, but his phone had been "missing" at the time of the incidents they described.

Ruiz testified further that he was not aware the car he drove on January 21 had been stolen from Lucio. Ruiz found it "pretty odd" when the police called him at the hotel room, and he was not aware of any warrant for his arrest. Ruiz never told the woman he was with that she could not leave the room. He "didn't hurt nobody" and "ain't going to keep nobody hostage."

Ruiz admitted his escape from the hospital, explaining that he was concerned about the health of his youngest daughter.

## II. DISCUSSION

Ruiz raises eight claims of error—six in his opening brief and two in supplemental briefs.

In his opening brief, Ruiz raises two claims regarding his convictions. He contends the evidence was insufficient to support the conviction for assault with a firearm, (count 2) and his trial counsel was ineffective for failing to object to the prosecutor's comments in closing argument about the crime of assault with a firearm.

Regarding his sentence, Ruiz asserts in his opening brief that the trial court imposed an unauthorized sentence for the witness or victim dissuasion conviction (count 11), and that the punishments for his robbery conviction (count 7) and attempted robbery conviction (count 9) must be stayed under section 654. He also asserts that this court should order the trial court to amend the judgment, pursuant to Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869), to vacate a criminal justice administration

fee imposed at his sentencing, and direct the trial court to correct certain errors in the abstract of judgment.

In his supplemental briefing, Ruiz contends the matter should be remanded for resentencing due to recent changes to section 654 made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill 518) and to section 1170 made by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567).

We first address Ruiz's claim challenging the sufficiency of the evidence on his conviction for assault with a firearm. Because we reverse that conviction and direct a remand for full resentencing, we do not address Ruiz's related ineffective assistance of counsel claim and several of his sentencing claims. However, notwithstanding our decision to vacate Ruiz's sentence and remand for resentencing, to assist the trial court at resentencing, we address Ruiz's section 654 claims regarding counts 7 and 9 and discuss errors in the abstract of judgment.

A. *Sufficiency of Evidence for Assault with a Firearm*

Ruiz claims that the evidence is insufficient to support his conviction on count 2 for assaulting Michael V. with a shotgun because the prosecution did not present any direct or circumstantial evidence that the shotgun was loaded. For the reasons explained below, we agree.

1. Legal Principles

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319; *People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)

"In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.' " (*Ibid*.) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

Section 245, subdivision (a)(2), " 'punishes "[a]ny person who commits an assault upon the person of another with a firearm." Assault is defined as "an unlawful attempt, *coupled with a present ability*, to commit a violent injury on the person of another." [Citation.] "Once a defendant has attained the means and location to strike immediately he has the 'present ability to injure.' " ' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; see §§ 240, 245, subd. (a)(2).) "Assault with a deadly weapon can be committed by pointing a gun at another person." (*People v. Raviart* (2001) 93 Cal.App.4th 258, 263.) Nonetheless, " '[a] long line of California decisions holds that an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening [manner] at another person.' [Citation.] However, the fact that the gun was loaded may be inferred from circumstantial evidence, and [courts] will uphold an assault conviction if the inference is reasonable." (*People v. Penunuri* (2018) 5 Cal.5th 126, 147; see *People v. Rodriguez* (1999) 20 Cal.4th 1, 11, fn. 3, 12 (*Rodriguez*); see also *People v. Wolcott* (1983) 34 Cal.3d 92, 99 (*Wolcott*) [" 'if a person points an unloaded gun at another, without any intent or threat to use it as a club or bludgeon, he does not commit . . . assault under Penal

10

Code section 240' "]; *People v. Orr* (1974) 43 Cal.App.3d 666, 672 (*Orr*) ["[P]ointing an unloaded gun at another person with no effort or threat to use it as a bludgeon, is not an assault with a deadly weapon. This is for the reason that there is no present ability to commit a violent injury on the person."].)

### 2. Jury Instructions and Closing Argument

In accord with the elements of section 245, subdivision (a)(2), the trial court instructed the jury (using CALCRIM No. 875) that to convict for assault with a firearm, the prosecution was required to prove: (1) "The defendant did an act with a firearm that by its nature would directly and probably result in the application of force;" (2) "The defendant did that act willfully;" (3) "When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;" and (4) "When the defendant acted he had the present ability to apply force with a firearm to a person." The instruction further defined a firearm as "any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion."[7]

No instruction informed the jurors that merely pointing an unloaded gun at another person with no effort or threat to use it as a bludgeon does not constitute assault with a firearm. (See *Rodriguez*, *supra*, 20 Cal.4th at p. 11, fn. 3; *People v. Fain* (1983) 34 Cal.3d 350, 357, fn. 6; *Orr*, *supra*, 43 Cal.App.3d at p. 672.)

Furthermore, in closing argument, the prosecutor told the jury that "the classic example [of assault with a firearm] is pointing a firearm at somebody." The prosecutor also argued that "merely pointing the gun at [Michael V.] is easily enough to satisfy" section 245, subdivision (a)(2). Thereafter, the prosecutor displayed on a board the elements of assault with a firearm and said, "There are a lot of elements up there, but just

---

[7] Ruiz does not challenge the correctness of the trial court's instruction.

11

know that pointing a firearm at somebody within range satisfies all these elements." After noting Michael's testimony about Sonny and Ruiz pointing the shotgun at him, the prosecutor continued, "So somebody pointing a gun at Michael is enough, and it satisfies assault with a firearm looking at all of these elements. Those are all met here. [¶] *There's also no requirement here that the gun be loaded or that it be used or fired at all*. There's nothing in that instruction that requires any type of actual discharge of a firearm. So just pointing it at him is enough, and it's satisfied here." (Italics added.) The prosecutor made no argument that Ruiz or Sonny had attempted to use the shotgun as a bludgeon.

### 3. Analysis

The police never recovered the shotgun, and no direct evidence demonstrated that the shotgun was loaded. Thus, we must look to the circumstantial evidence to determine whether it provides substantial evidence through logical inferences from which a reasonable jury could conclude beyond a reasonable doubt that the shotgun was loaded.

The trial evidence showed that, after arguing with Candelaria B. about some missing money, Ruiz retrieved a shotgun from another location, brought it to the condominium covered by a cloth, and leaned it against the living room wall. When Ruiz uncovered the shotgun, Michael thought it was "no big thing." Michael described the shotgun as about 32 inches long and black or brown in color. It had a piece that could be "rack[ed] or move[d]." Michael recognized it as a shotgun, "[j]ust by looking at it." Michael had seen a shotgun before in movies or on TV but "not in real life." Michael did not testify that he and Ruiz discussed the shotgun at all.

Later, Ruiz told Michael that "somebody had to pay for whatever [Candelaria] did" and ordered Michael to empty his pockets and remove his clothing. At that time, Sonny stood behind Michael and pointed the shotgun at Michael's face/head. Michael testified Ruiz did not "say[] anything like" " '[i]f you don't do what I'm telling you to do, I'll shoot you.' " Michael testified further that while this was happening, he heard "some

12

kind of noise" and that Sonny "ha[d] his hands on the trigger, pointed to [Michael's] head." In addition, Michael recalled Ruiz minding the shotgun during the incident and pointing it at him in the morning. Sometime during the incident, Ruiz gestured toward the gun, and Michael testified that he obeyed Ruiz's commands because of the gun. While they were in the apartment together, Ruiz did not point the gun at Michael (except in the morning, after the attack had already occurred) or handle it except for moving it from room to room.

The Attorney General asserts that Michael's testimony—though containing "some ambiguity"—"sufficiently demonstrates that Sonny did rack or load a round in the firearm," which indicates that the shotgun was loaded. We are not convinced that a reasonable fact finder can logically infer from Michael's testimony that the "noise" he heard was that of the shotgun being loaded or its forestock being worked to chamber a shotgun shell (cartridge). When the prosecutor asked Michael whether anyone had "rack[ed] or seem[ed] to load the shotgun," Michael responded by saying "It was behind me." The prosecutor next asked, "Did you hear anything that made you think the shotgun was --." Michael interrupted the question saying, in part, "Yeah. He made some -- there was some kind of noise and he pointed it at [his] head. And I am thinking, 'What the heck is going on? Why is this happening? What are these guys thinking?' " The prosecutor did not pose any follow-up questions to this answer and did not ask whether Sonny had racked or loaded the shotgun.

Michael did not provide any details about the noise he had heard when the shotgun was pointed at his head. The prosecution presented no evidence about how shotguns are loaded and the relevance, if any, of sounds to that action. The jury heard no evidence about the relationship of racking to cartridges and whether a shotgun can be racked without a cartridge inside. The jury heard no evidence that any shotgun shells or other firearm bullets were found in the apartment. We therefore do not agree with the Attorney General that Michael's statement that "there was some kind of noise" just before Sonny

13

pointed the shotgun at his head constitutes substantial evidence from which a jury could infer beyond a reasonable doubt that the weapon was loaded.

The Attorney General argues further that Michael's perception of the shotgun as a threat to his safety (given that it was not being used as a bludgeon) supports a finding that the gun was loaded. But Michael's testimony makes clear that he did not actually know whether the gun was loaded. Michael and Ruiz had no discussion about the gun. Michael did not see Ruiz load the gun. Ruiz never said anything to Michael about the gun at all. Michael did not testify that he had seen Ruiz fire a weapon before or even that he was afraid of him. Michael had never seen a shotgun before "in real life." Michael thought it was "no big thing" that Ruiz brought the shotgun into the condominium until Sonny pointed it at him. Under these circumstances, Michael's belief that the gun was loaded does not constitute substantial evidence that it was in fact loaded. (See *Wolcott*, *supra*, 34 Cal.3d at p. 99 [the fact that a gun was loaded must be proved " 'regardless of the fact . . . whether the party at whom it was menacingly pointed was thereby placed in great fear' "].)

The Attorney General also contends that Ruiz's retrieval of the gun following his argument with Candelaria and his statement that someone " 'had to pay' " for what Candelaria had done constitute substantial evidence from which a reasonable jury could infer the gun was loaded. While we agree these are possible inferences, they are highly speculative in context. There is no evidence that Candelaria (or Michael) had a gun, that there was a history of prior violence between Ruiz and Candelaria, or any other factor that would suggest that Ruiz would have loaded the gun prior to bringing it to the apartment.

The Attorney General cites no other circumstantial evidence from which the jury might have inferred the shotgun was loaded, and after having carefully reviewed the record, we have not identified any.

14

We recognize that there are a number of cases in which reviewing courts have upheld convictions for crimes that require proof of a loaded gun based upon circumstantial evidence of that fact, including the behavior of the defendant and the victim. (See, e.g., *Rodriguez*, *supra*, 20 Cal.4th at p. 12; see also *id*. at p. 13; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 541.) However, even compared to these precedents, the evidence here was exceedingly weak.

Our concern about the paucity of evidence that the shotgun was loaded is significantly magnified by our lack of confidence that the jury understood it needed to make such a finding in the first place. The jury instructions (which Ruiz has not challenged) did not inform the jury that they needed to find the gun was loaded to convict him of assault with a firearm. Critically, the prosecutor affirmatively told the jurors in closing argument that they did *not* need to find the gun was loaded. The prosecutor informed the jury that a finding that the gun was pointed at Michael was enough to convict Ruiz of count 2. This misstatement of the law did not draw any objection. Ruiz's trial counsel did not address this issue at all in his closing argument. In addition, the jury instruction on the firearm enhancement allegations attached to counts 3 through 5 told the jurors that "[a] firearm does not need to be loaded."

We have found no evidence in the record of any discussion among the parties or the trial court that the jury on count 2 would need to find the shotgun was loaded in order to conclude that the present-ability element of the crime had been proven. Thus, we have little reason to believe that the jury understood they needed to make this finding, weighed the evidence presented on the subject, and in fact unanimously determined beyond a reasonable doubt that the shotgun was loaded.

Under these circumstances, we conclude no substantial evidence in the record supports Ruiz's conviction on count 2 of assault with a firearm such that a reasonable trier of fact could find him guilty beyond a reasonable doubt. Even applying the highly deferential substantial evidence standard of review (see *Zamudio*, *supra*, 43 Cal.4th at

p. 357), we decide on this record that the evidence falls short.  We thus reverse Ruiz's conviction on count 2 and bar any retrial on that count.  (See *People v. Hatch* (2000) 22 Cal.4th 260, 271–272.)

In light of our reversal of Ruiz's conviction on count 2, we vacate Ruiz's sentence entirely and direct the trial court to fully resentence him on remand.  (See *People v. Navarro* (2007) 40 Cal.4th 668, 681; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.)  Given our decision on Ruiz's sufficiency claim, we need not address his ineffective assistance claim that challenges his trial counsel's failure to object to the prosecutor's apparent misstatement of law in closing argument regarding the assault with a firearm charge.

B.  *Sentencing Claims*

Although we conclude that Ruiz's sentence should be vacated entirely based on the reversal of the conviction on count 2, for the benefit of the trial court at resentencing we will address two claims of sentencing error raised under section 654—namely, that the punishments imposed on the conviction for robbery committed against Tuan H. (count 7) and the conviction for attempted robbery committed against Lucio R. (count 9) should be stayed.

We, however, do not address Ruiz's additional sentencing claim that the trial court pronounced an unauthorized sentence when, pursuant to section 1170.15, it imposed a full consecutive term for his witness or victim dissuasion crime against Lucio (count 11).[8]

---

[8] Section 1170.15 provides in relevant part:  "Notwithstanding subdivision (a) of [s]ection 1170.1 which provides for the imposition of a subordinate term for a consecutive offense of one-third of the middle term of imprisonment, if a person is convicted of a felony, and of an additional felony that is a violation of [s]ection 136.1 or 137 and that was committed against the victim of, or a witness or potential witness with respect to, or a person who was about to give material information pertaining to, the first felony, . . . the subordinate term for each consecutive offense that is a felony described in this section shall consist of the full middle term of imprisonment for the felony for which a consecutive term of imprisonment is imposed."  (§ 1170.15.)

16

At trial, neither party nor the probation department mentioned section 1170.15 in their submissions to the trial court regarding Ruiz's sentencing, and Ruiz did not object or make any argument when the court invoked section 1170.15 at his sentencing hearing. Given that the section 1170.15 issue was not explicated in the trial court and the Attorney General asserts in this appeal that Ruiz forfeited his current claim of error, and because we otherwise are remanding this case to the trial court, we leave it to Ruiz (should he so choose) to assert at his resentencing the alleged inapplicability of section 1170.15 to count 11.

In addition, given our remand for full resentencing, we need not address Ruiz's three claims that are based on recent legislative changes to statutes governing sentencing (namely, section 654 (Assembly Bill 518) and section 1170 (Senate Bill 567)) and the imposition of fees (namely, Government Code section 6111 (Assembly Bill 1869)). If Ruiz so chooses, he may raise his claims regarding the applicability of Assembly Bill 518, Senate Bill 567, and Assembly Bill 1869 in the trial court during resentencing. We express no opinion as to how the trial court should exercise its discretion under current law when it resentences Ruiz.

### 1. Background for Section 654 Claims

Regarding count 6 (carjacking) and count 7 (robbery), Tuan H. testified that Ruiz summoned him inside a hotel room and, after Tuan entered, Ruiz's friend pulled out a knife and threatened Tuan. Ruiz ordered Tuan to remove his pants. Ruiz took Tuan's car keys, phone, and wallet out of the pants. Ruiz then left in Tuan's car, which was parked outside the room, taking Tuan's pants and wallet. In closing argument, the prosecutor told the jury that the carjacking and robbery offenses both occurred at the hotel room when Ruiz took Tuan's pants (which contained his keys) and his car "was just right outside."

In count 9, the information alleged that Ruiz committed attempted second degree robbery by attempting to take Lucio R.'s "watch" against his will by means of force and

17

fear. In count 11, the information alleged witness or victim dissuasion by use of force or threat of force against Lucio.

At trial, Lucio testified that after Ruiz had punched him, he locked himself inside his car, realized that he no longer had his phone or keys, and "the next thing [he] did was turn on [his] watch." When he did so, "they [i.e., Ruiz and his associates] noticed the light turn on and they . . . immediately came towards" Lucio saying, "hey what is that, give it to us, demanding [] the watch." Ruiz had Lucio's car keys in his hand and kept unlocking the doors remotely while Lucio locked the doors in response. This back-and-forth went on "for a[ ]while." Ruiz and his associates "at the same time" demanded the watch because an associate told Ruiz that Lucio could make a call using his watch. Ruiz then "started banging on the window" with his fist and said "give it to me."

In closing argument regarding counts 9 and 11, the prosecutor argued that Ruiz and his associates knew what Lucio could do with his smartwatch and "so their priority was to stop Lucio from calling 9-1-1, from bringing [the] police there, to catch them in what they did." The prosecutor stated further that "as soon as [Lucio] turned [the watch] on, [Ruiz] and his friends were talking about the watch, and [Ruiz] immediately came over to the car," "demanded the watch and pounded on the window of Lucio's car. . . . So this was a man capable of shattering this window, getting to Lucio and causing and inflicting more injuries on him. And the reason why is because he wanted to keep Lucio from calling 9-1-1. There was never a rush to get into that car until Lucio turned on his watch, and then the danger increased substantially, because [Ruiz] was now outside of the window eventually about to shatter that window."

Subsequently, in a sentencing brief, the prosecutor suggested to the trial court that, in light of count 6, Ruiz's punishment on count 7 should be stayed pursuant to section 654. The prosecutor similarly suggested that the trial court should stay Ruiz's punishment on count 9, in light of count 11, under section 654.

18

At sentencing, without any elaboration on the record, the trial court rejected the prosecutor's suggestions and imposed unstayed terms on counts 6 and 7 and counts 9 and 11. The trial court, however, noted that it had considered the sentencing briefs and explained that the parties and court had "discussed sentencing off the record for quite a while to straighten out any issues that might involve Penal Code section 654." Neither party offered any further comment for the record when asked by the court if they wished to be heard.

## 2. Legal Principles Regarding Section 654

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct."[9] (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) Even concurrent sentences on convictions subject to section 654 are prohibited; the sentence on one of the two applicable convictions must be imposed and then stayed. (*People v. Deloza* (1998) 18 Cal.4th 585, 591–592.) "[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Application of section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311 (*Corpening*).) Only if the case involves more than one act does a court consider whether the case involves a course of conduct. (*Ibid*.) "At

---

[9] Current section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Our analysis of the potential applicability of section 654 is not affected by the recent legislative amendment to section 654 in Assembly Bill 518 granting the trial court discretion to select which term of imprisonment to impose (as opposed to mandating imposition of the longest potential term of imprisonment, as was required by the former law). (See Stats. 2021, ch. 441, § 1.)

step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*Id*. at p. 312.) "Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Id*. at p. 313.) If the convictions involve more than one act, the court reaches "step two of the section 654 analysis: whether the [course of conduct] involved multiple intents and objectives." (*Id*. at p. 316.)

At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 341.) Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*Harrison*, at p. 335.) We review the record for substantial evidence to support implied findings sufficient to uphold the sentence under section 654. (See *People v. Osband* (1996) 13 Cal.4th 622, 730–731.)

### 3. Analysis of Section 654 Claims

Ruiz contends the trial court should have stayed the punishment for his conviction on count 7 for robbing Tuan H. because both the robbery and the carjacking (count 6) were based on the single act of taking Tuan's pants (which contained his car keys) by force or fear. The Attorney General agrees with Ruiz and concedes that multiple punishment of Ruiz on counts 6 and 7 is precluded by section 654. We accept the concession, given the state of the evidence and the prosecution's theory of Ruiz's guilt on those counts. (See *Corpening*, *supra*, 2 Cal.5th at pp. 314, 316–317.) We thus will direct the trial court on remand to apply section 654 when resentencing Ruiz on counts 6 and 7.

Additionally, Ruiz contends his convictions for attempted robbery (count 9) and attempting to prevent or dissuade Lucio R. from reporting a crime (count 11) were based on the same facts surrounding Ruiz's punch to Lucio's face, the taking of Lucio's keys and phone, Lucio's effort to use his smartwatch to call the police, and Ruiz's attempt to take the smartwatch before Lucio ran away. Ruiz asserts further that the "separate objective exception does not apply here since [his] sole objective in committing the attempted robbery, even according to the prosecutor, was to prevent the victim from reporting the assault."

The Attorney General counters that substantial evidence supports the trial court's unexplained finding that the attempted robbery of Lucio R. was not contemporaneous to the attempt to dissuade Lucio and rested on a different criminal intent and objective.

We are not persuaded by Ruiz that his convictions on counts 9 and 11 are based on a single physical act or that they comprise an indivisible course of conduct committed with a single intent and objective. The evidence here demonstrates that more than a single physical act served as the basis for convicting Ruiz of attempted robbery and witness or victim dissuasion. By remotely unlocking the car doors while he and his associates were demanding the watch, Ruiz took a direct but ineffectual step toward committing robbery. This conduct was distinct from Ruiz's subsequent actions that included violently banging on the car window and demanding the watch after hearing from his associate that Lucio could make a phone call using his watch. Furthermore, there is substantial evidence that Ruiz harbored different purposes when he first repeatedly unlocked Lucio's car doors while he and his associates demanded the watch and then when he approached the car, banged on the window, and demanded the watch. Ruiz's former actions demonstrate an intent and objective to simply take the watch for personal gain. By contrast, his later actions betray an intent and objective to take the watch to prevent or dissuade Lucio from calling the police.

21

Ruiz's reliance on *People v. Galvez* (2011) 195 Cal.App.4th 1253 as support for his claim of section 654 error is misplaced. *Galvez* is materially distinguishable from the present case. There, the perpetrators's effort to take the victim's cell phone involved the same objective throughout the incident and occurred concurrently with the effort to dissuade the victim from using his phone to report an attack he had witnessed. (*Galvez*, at pp. 1257–1258, 1263.) Here, Ruiz's conduct outside the car provides substantial evidence supporting a finding of separate efforts at taking the watch that had distinct objectives.

For these reasons, we conclude that the trial court properly imposed unstayed sentences on counts 9 and 11 because section 654 does not apply to those counts.

E. *Errors in the Abstract of Judgment*

Ruiz contends that the abstract of judgment should be corrected in three respects. Because we have decided to vacate Ruiz's sentence and remand for full resentencing, we will not order any correction to the abstract of judgment. On remand, the trial court will generate a new abstract of judgment based on its resentencing and will exercise its usual prerogative to ensure that the abstract of judgment comports with the sentence pronounced. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

Nevertheless, for the trial court's benefit at resentencing and in completing a new abstract of judgment, we note the following anomalies that appear in the original abstract of judgment:

(1) Although the trial court did not mention Ruiz's seven prison prior enhancements at the February 2020 sentencing hearing, the abstract of judgment indicates that the court struck the punishment for those prison priors. Because the seven prison prior enhancement allegations in this case are legally invalid under current law (see § 667.5, subd. (b); Stats. 2019, ch. 590, § 1 [Senate Bill No. 136]; see also § 1171.1, subd. (a); Stats. 2021, ch. 728, § 3 [Senate Bill No. 483]) the new abstract of judgment should not include a reference to those prison prior enhancements.

22

(2) Although the trial court did not mention at sentencing the GBI enhancement attached to count 4 that the jury had found true, the clerk's sentencing minute order indicates that the trial court struck that enhancement as "not proven at trial" and the abstract of judgment indicates that the punishment was struck. The court should address on the record at Ruiz's resentencing the GBI enhancement attached to count 4 found true by the jury.

(3) The abstract of judgment indicates that on count 3 Ruiz was convicted of "Carjacking" under section "215[, subd.] (a)." Ruiz, in fact, was convicted on count 3 of *robbery* under section *212.5, subdivision (a)*. The new abstract of judgment should correctly reflect the crime of conviction and Penal Code section for count 3.

(4) The abstract of judgment does not indicate the length of the punishment imposed and then stayed, under section 654, for count 2 (assault with a firearm) and count 5 (felony false imprisonment). Although we have vacated Ruiz's conviction for count 2, we have directed the trial court to stay the punishment on count 6 or count 7 pursuant to section 654. The new abstract of judgment should indicate the term imposed (surrounded by parentheses in the "TIME IMPOSED" column of item No. 1) for any count on which the punishment is stayed pursuant to section 654.[10]

## III. DISPOSITION

We reverse for insufficient evidence Ruiz's conviction on count 2 and remand the matter to the trial court to dismiss that count. The convictions on the remaining counts and the true findings on the allegations attached to those counts are affirmed. Ruiz's sentence is vacated in its entirety. The matter is remanded to the trial court for

---

[10] The Attorney General additionally asserts that the abstract of judgment incorrectly states that the sentence imposed on count 4 (battery) is one year (instead of one year four months). The Attorney General is mistaken. The abstract of judgment correctly reflects the trial court's oral pronouncement of sentence on count 4, i.e., a consecutive one-year term, which constitutes one-third the midterm sentence (see § 243, subd. (d)), plus a consecutive four-month term for the attached firearm enhancement (see § 12022, subd. (a)(1)).

23

resentencing consistent with this opinion and with directions to stay execution of the imposed sentence for either count 6 or count 7 (Pen. Code, § 654).  Following resentencing, the trial court is directed to prepare a new abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.

_____
Danner, J.

WE CONCUR:


_____
Bamattre-Manoukian, Acting P.J.




_____
Wilson, J.




**H047959**
*People v. Ruiz*