Filed 6/24/22  P. v. Llamas-Escalante CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS LLAMAS-ESCALANTE,<br><br>    Defendant and Appellant. | H049361<br>(Monterey County<br>Super. Ct. No. 19CR008559) |

A jury convicted defendant Luis Llamas-Escalante (Escalante) of first-degree murder, two counts of assault with a firearm, and shooting at an inhabited dwelling.[1]  The trial court sentenced Escalante to 50 years to life in prison, consecutive to a term of 10 years four months, and imposed restitution fines and certain assessments.

On appeal, Escalante raises two claims of error.  He contends the punishment imposed for his conviction for shooting at an inhabited dwelling must be stayed under Penal Code section 654, and his trial counsel provided ineffective assistance by failing to object to the imposition of a $5,000 restitution fine and two assessments totaling $280.

For the reasons explained below, we affirm the judgment.

---

[1] The operative charging document in this matter stated Escalante's full name as "Luis Enrique Llamas-Escalante."  At trial, defense counsel explained that Escalante's full name is "Luis Enrique Escalante Llamas," and he "goes by 'Escalante.' "

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

On April 26, 2021, the Monterey County District Attorney filed a second amended information (information) charging Escalante with the willful, deliberate, and premeditated murder of Santos Emilio Barriga (Pen. Code, §§ 187, subd. (a), 189;[2] count 1), four counts of assault with a firearm (§ 245, subd. (a)(2); counts 2–5), and shooting at an inhabited dwelling (§ 246; count 6). Counts 2 through 5 each alleged a different victim, Veronica T., Peyton H., Rico T., and Antonella T., respectively.

As to count 1, the information further alleged that Escalante personally used a handgun (§ 12022.53, subd. (b)), personally and intentionally discharged a handgun (§ 12022.53, subd. (c)), and personally and intentionally discharged a handgun causing great bodily injury and/or death to Barriga (§ 12022.53, subd. (d)). As to counts 2 through 5, the information alleged that Escalante personally used a handgun (§ 12022.5, subd. (a)). Lastly, as to count 6, the information alleged that Escalante personally and intentionally discharged a handgun causing great bodily injury and/or death to Barriga (§ 12022.53, subd. (d)).

In May 2021, the jury convicted Escalante as charged in count 1 (first degree murder), counts 2 and 3 (assault with a firearm on Veronica and Peyton, respectively), and count 6 (shooting at an inhabited dwelling). In addition, the jury found true the firearm enhancement allegations attached to those counts. The jury acquitted Escalante on counts 4 and 5 (assault with a firearm on Rico and Antonella, respectively).

In July 2021, the trial court sentenced Escalante to an indeterminate term of 50 years to life, consecutive to a determinate term of 10 years and four months. Specifically, for count 1, the court imposed a 25-years-to-life term, consecutive to a 25-years-to-life term for one of the three attendant firearm enhancements (§ 12022.53, subd. (d)). For the

---

[2] Unspecified statutory references are to the Penal Code.

2

other two firearm enhancements attached to count 1 (§ 12022.53, subd. (b), (c)), the court imposed terms of 10 years and 20 years, respectively, but ordered both those terms stayed (§ 654). For count 2, the court imposed the upper term of four years, plus four years for the attached firearm enhancement. For count 3, the court imposed a consecutive one-year term (one-third the midterm), plus a 16-month term for the attached firearm enhancement. For count 6, the court imposed a concurrent upper term of seven years.

Additionally, the trial court imposed a $5,000 restitution fine (§ 1202.4, subd. (b)), a suspended $5,000 parole revocation restitution fine (§ 1202.45), a $160 court operations assessment (§ 1465.8, subd. (a)(1)), a $120 court facilities assessment (Gov. Code, § 70373), and victim restitution (§ 1202.4, subd. (f)).

Escalante timely appealed.

B. *Evidence Presented at Trial*

In July 2019,[3] Santos Barriga and his spouse Veronica T. were living in a house in Salinas with Veronica's four children, Kobe, Peyton, Rico, and Antonella.[4] Destiny Lopez also lived there. Lopez was Veronica's cousin's ex-girlfriend and a close friend of Veronica's. Lopez and Escalante were involved romantically and had a child together. Escalante moved into Barriga and Veronica's house and stayed in a bedroom with Lopez. Escalante and Lopez understood that they would pay rent of $300 per month to Barriga and Veronica. Barriga and Escalante got along well and were friends.

At one point in July, Escalante went to San Jose for a week to work in construction. He left some of his clothes and shoes at the house, and Veronica expected him to return on August 2. However, during the week that he was away, Escalante told Lopez that he was going to remain in San Jose and asked her to retrieve his clothing and

---

[3] Unless otherwise indicated, all dates were in 2019.
[4] Kobe and Peyton were teenagers; Rico and Antonella were around six and five years old, respectively.

shoes.  Lopez and Escalante owed some rent, and Barriga would not let Lopez take Escalante's belongings without paying it.

In the late afternoon of August 1, Lopez went to the house because Escalante had again asked her to get his belongings.  Lopez spoke to Barriga, who again did not let her collect the belongings.  Lopez left, called Escalante from Watsonville, and told him she had been unsuccessful.  He yelled at her, telling her to get the "fucking clothes."  Before hanging up on Lopez he yelled, " 'bet.' "  Lopez took this to mean that Escalante was "going to go and get them."

Later that day, Escalante called Lopez from outside her location in Watsonville, apparently having tracked her there through an application on her cell phone.  Escalante had three friends with him.  Lopez, Escalante, and his friends drove from Watsonville to Barriga and Veronica's house in Salinas.  Escalante said "That he was just getting his clothes."

Around 10:30 p.m. on August 1, Veronica was in her living room, lying on the couch with Barriga watching a movie.  Rico and Antonella also were on the couch "in their blankets," and Peyton was inside the house.  Lopez entered the house and said she had brought Escalante there to fight Barriga because she did not want to be "in the middle of it."

Veronica and Barriga moved from the couch to their front doorway, and Veronica saw Escalante outside on the walkway to the house.  Veronica's teenage son Peyton also went to the front door.  Escalante yelled to Lopez, " 'Get my stuff, stupid bitch.  Get my stuff, bitch.' "  Barriga told Escalante not to speak to Lopez that way.  Escalante challenged Barriga to a fight, calling him a "pussy."  Lopez told Veronica and Barriga to give Escalante the clothes, but Escalante yelled at Lopez, " 'Get the fuck outside, bitch.' "  Escalante then pulled out a gun from his waist area and asked for his belongings.

4

Barriga pushed Veronica and Peyton toward the interior of the house and started to close the front door. When Barriga had his back turned, Escalante moved one or two feet closer to Barriga and started firing from about five feet away, directly inside the house. Escalante fired several shots and hit Barriga in the back. As Escalante fired, Veronica yelled to him about her children. Veronica, Peyton, and Lopez testified that Rico and Antonella were on the couch (which was in line with the front doorway) as the shots were fired.[5] After Escalante finished shooting, he ran, pushed Lopez into the car, and jumped in. The car sped off.

As the group drove away, Lopez hit Escalante and said, " 'What the hell, the kids.' " Escalante pointed his gun at Lopez and replied, " 'Shut the fuck up, bitch. Give me your phone.' " He then broke Lopez's phone and threw it out of the car window.

Veronica called 911 and reported that Escalante had shot her husband. Barriga lay near the front doorway. When a police officer arrived and asked Barriga who had shot him, Barriga refused to say, replying " 'Nobody shot me.' " Barriga died later at a hospital from a gunshot wound to the back. The bullet that entered Barriga's back did not exit his body. In addition, police found two bullet impacts in the front-door frame, a bullet/projectile in the living room, and bullet holes in a punching bag (that had been next to Peyton during the firing) and a blanket in the living room.

After the shooting, Escalante, his friends, and Lopez drove to San Jose. There, Escalante told Lopez to get into a Volvo parked on the side of a street. Escalante had borrowed the Volvo from a construction co-worker earlier on the day of the crime (August 1) and returned it to the coworker early on the morning of August 2. According to the coworker, Escalante seemed nervous when he returned the car. Later that day, the coworker again lent the Volvo to Escalante, but he never returned it.

---

[5] Peyton, however, told police immediately following the shooting that he had taken Rico and Antonella to a back room once Escalante started firing.

On August 4, at around 5:00 a.m., a San Jose police officer saw a Volvo drive through a stop sign while speeding. The car made a sharp turn and then crashed into two parked cars. Lopez was driving the car, and Escalante was in the front passenger's seat. Escalante exited the car and ran away from the police. An officer chased Escalante and took him into custody.

Cell phone records placed Escalante's phone near the house in Salinas around the time Barriga was shot.

Escalante presented no witnesses in his defense.

## II. DISCUSSION

A. *Section 654*

In his first claim of error, Escalante contends the trial court erred by failing to stay the punishment on count 6 (shooting at an inhabited dwelling) because Escalante's only intent in firing his gun was to kill Barriga and assault Veronica and Peyton. The Attorney General counters that the multiple victim exception to section 654 permits the unstayed punishment imposed on count 6.

### 1. Background

In his sentencing brief, Escalante argued that the punishment for counts 2, 3, and 6 should be stayed pursuant to section 654. He asserted "the prosecution succeeded on its theory that [he] went to the home of Santos Barriga with the intent to kill him." He further asserted that his assault with a firearm convictions (counts 2 & 3) "were premised only on [Veronica's and Peyton's] presence in the residence where the shooting occurred, not on the theory that [he] harbored any specific intent to shoot them" and his shooting at an inhabited dwelling conviction (count 6) likewise "was not premised on any particular specific intent to shoot at the dwelling, but was only part of his single intent to kill Santos Barriga." Escalante argued that his "conduct involved only a single act of shooting and then fleeing— it was not a scenario where multiple physical acts occurred over a lengthy

6

period of time." Alternatively, Escalante argued that the punishments for counts 2 and 3 should be stayed "as [section] 654 to count six."

In response, the prosecutor invoked the multiple victim exception to section 654. The prosecutor asserted that "the existence of two additional victims [i.e., Rico and Antonella] inside the house support[s] the application of the multiple victim exception to the charge of shooting at the inhabited dwelling." In addition, the prosecutor requested a consecutive sentence on count 6, arguing "[t]he fact that Mr. Escalante chose to fire the gun multiple times with two little children inside the house warrants consecutive sentencing . . . . Instead of shooting once at his target, he decided to fire the gun at least four times. Each trigger pull signifies an increased risk to the children and constitutes a separate act of violence."

At the sentencing hearing, the trial court decided to impose consecutive determinate terms on counts 2 and 3 and "did not find [section] 654 applied due to these being violent felonies, and the victims being different people." Regarding the concurrent determinate term imposed on count 6, the court explained that "[b]ecause there were the individuals[,] victims inside the house, being the young children[, section] 654 wouldn't be appropriate."

### 2. Legal Principles

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct."[6] (*People v. Assad* (2010) 189 Cal.App.4th 187, 200 (*Assad*).) Even

---

[6] Current section 654, subdivision (a), provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Our analysis of the underlying dispute here concerning the applicability of section 654 is not affected by a recent legislative amendment to section 654 that grants the trial court discretion to select which term of imprisonment to impose (as opposed to mandating imposition of the longest potential term of imprisonment, as was required by the former law). (See Stats. 2021, ch. 441, § 1 [Assembly Bill No. 518 (2021-2022 Reg. Sess.)].)

concurrent sentences on convictions subject to section 654 are prohibited; the sentence on one of the two applicable convictions must be imposed and then stayed. (*People v. Deloza* (1998) 18 Cal.4th 585, 591–592.) "[T]he purpose of section 654 'is to insure that a defendant's punishment will be commensurate with his culpability.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211.)

Application of section 654 "requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Only if the case involves more than one act does a court consider whether the case involves a course of conduct. (*Ibid*.) "At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act." (*Id*. at p. 312.) If the convictions involve more than one act, the court reaches "step two of the section 654 analysis: whether the [course of conduct] involved multiple intents and objectives." (*Id*. at p. 316.) At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective. (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on another ground in *People v. Correa* (2012) 54 Cal.4th 331, 341 (*Correa*).)

There is, however, a multiple victim exception to section 654. The California Supreme Court has "long held that 'the limitations of section 654 do not apply to crimes of violence against multiple victims.' " (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.) "Under this exception, 'even though a defendant entertains but a single principal objective during an indivisible course of conduct, he may be convicted and punished for each crime of violence committed against a different victim.' [Citations.] The reason for the multiple victim exception is that 'when a defendant " 'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several

8

persons,' his greater culpability precludes application of section 654." ' " (*People v. Garcia* (1995) 32 Cal.App.4th 1756, 1781 (*Garcia*).) The multiple victim exception "permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent." (*Id*. at p. 1784.) Murder, assault with a firearm, and shooting at an inhabited dwelling are crimes of violence for purposes of this exception to section 654. (See *People v. Anderson* (1990) 221 Cal.App.3d 331, 338–339 (*Anderson*); *People v. Cruz* (1995) 38 Cal.App.4th 427, 434 (*Cruz*); *People v. Felix* (2009) 172 Cal.App.4th 1618, 1630–1631 (*Felix*); see also *Oates*, at p. 1063.)

Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*Harrison*, *supra*, 48 Cal.3d at p. 335.) When interpreting the scope and meaning of the multiple victim exception, we apply a de novo standard of review. (See *People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5.) Regarding whether the facts establish there were multiple victims of the crimes of violence, we review such finding for substantial evidence. (See *People v. Centers* (1999) 73 Cal.App.4th 84, 101.) An appellate court will sustain a trial court's implied factual determination in the application of section 654 if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730–731.)

3. Analysis

Escalante contends that his intent in firing three shots at Barriga was to kill him and, as for the bullet found in the living room, his "only intent as to that shot was to assault [Veronica] and Peyton." Escalante asserts further that his conviction for shooting at an inhabited dwelling "was merely incidental to this one objective."

The Attorney General does not argue that Escalante acted with more than one intent and objective during the course of his crime. Instead, the Attorney General asserts that the trial court properly imposed an unstayed punishment for count 6 pursuant to the multiple victim exception. Specifically, the Attorney General contends that although the

jury acquitted Escalante of assaulting Rico and Antonella (counts 4 & 5), "substantial evidence supports the trial court's conclusion that the children were victimized by [Escalante]'s Count 6 offense of shooting into the residence."

In his reply brief, Escalante retorts that the multiple victim exception does not apply because Rico and Antonella were named as victims in the information. Escalante argues that the fact he "was acquitted of assaulting Rico and Antonella is irrelevant. The relevant question, as demonstrated in *Felix* and *Anderson*, is whether Rico and Antonella were charged victims in other counts. [Citations.] Because they were, the multiple victim exception does not apply to the shooting at an inhabited dwelling count."

Assuming for argument's sake that Escalante harbored a single intent and objective when he fired his gun at Barriga, Veronica, Peyton, and their house, we are not persuaded that because Rico and Antonella were named as victims in other counts in the information, neither of them can be considered a different victim for purposes of the multiple victim exception. Generally, "the application of section 654 does not depend on the *allegations* of the charging instrument, but on what was *proven* at trial." (*Assad*, *supra*, 189 Cal.App.4th at p. 200.) Furthermore, absent "some circumstance 'foreclosing' its sentencing discretion . . . a trial court may base its decision under section 654 on any of the facts that are in evidence at trial, without regard to the verdicts. . . . After all, a court may even rely on facts underlying verdicts of acquittal in making sentencing choices." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1340, italics omitted.)

Escalante's reliance on *Felix* and *Anderson* to support his contention is misplaced because those cases do not address the circumstance present in this case. In *Felix* and *Anderson*, the appellate courts concluded that the multiple victim exception applied to the offense of shooting into a dwelling where a victim who was not named in another count was present in the dwelling. (*Felix*, *supra*, 172 Cal.App.4th at p. 1631; *Anderson*, *supra*, 221 Cal.App.3d at pp. 334, 338–339.) That conclusion, however, does not support

10

Escalante's different contention—not addressed in those cases—that the mere naming of a victim in a count of the information on which the defendant was acquitted precludes application of the multiple victim exception when sentencing on a count against that victim for which the defendant stands convicted.

Section 654 does not turn simply on whether a victim was named in some other count of the charging instrument. Rather, the crucial factor of the analysis is whether the violent offenses for which the defendant is being punished involve at least one different victim. (See *Garcia*, *supra*, 32 Cal.App.4th at pp. 1784–1785; *Cruz*, *supra*, 38 Cal.App.4th at p. 434.)

Here, the trial court's finding of multiple victims for the relevant violent offenses, including count 6, is supported by substantial evidence. Indeed, Escalante does not argue otherwise. Veronica, Peyton, and Lopez testified about Rico and Antonella being on the couch as Escalante fired the shots. Additionally, Veronica testified that she yelled at Escalante while he was shooting, saying " 'Enrique, my kids. Enrique, my kids.' " The evidence thus proved there were people who were victimized by Escalante's shooting into the dwelling who were not victims in any other crime for which Escalante was convicted and punished.

Section 654 calibrates punishment to the defendant's culpability. (*Correa*, *supra*, 54 Cal.4th at p. 341.) Rico's and Antonella's presence in the house as Escalante fired his gun at the dwelling renders Escalante more culpable and permits multiple punishment for each of the violent crimes for which he was ultimately convicted. We conclude the trial court did not err by imposing an unstayed term of imprisonment on Escalante for shooting at an inhabited dwelling.

B. *Ineffective Assistance of Counsel*

Relying principally on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) and *People v. Cowan* (2020) 47 Cal.App.5th 32, review granted June 17, 2020, S261952 (*Cowan*), Escalante contends that his trial counsel was prejudicially ineffective for failing

11

to object to the trial court's imposition of a $5,000 restitution fine (§ 1202.4, subd. (b)), $160 court operations assessment (§ 1465.8, subd. (a)(1)), and $120 court facilities assessment (Gov. Code, § 70373).[7]

The Attorney General counters that Escalante forfeited any claim that imposition of the restitution fine and assessments violated his rights to due process and equal protection and against excessive fines.[8]  Further, the Attorney General contends that Escalante has not demonstrated that his trial counsel's failure to object or request an ability-to-pay hearing amounts to deficient performance.

      1.  Analysis

"In January 2019, *Dueñas* held that 'due process of law requires [a] trial court to . . . ascertain a defendant's present ability to pay before it *imposes*' (1) 'court facilities and court operations assessments' (under Pen. Code, § 1465.8 and Gov. Code, § 70373, respectively), or (2) a restitution fine (under Pen. Code, § 1202.4).  (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164, italics added; see *id.* at pp. 1167, 1172; see also, *id.* at p. 1172 [restitution fine imposed without an ability-to-pay hearing must be stayed until such a hearing is conducted].)"[9]  (*People v. Hicks* (2019) 40 Cal.App.5th 320, 325, review granted Nov. 26, 2019, S258946 (*Hicks*).)

---

[7] Escalante was represented by two attorneys at his trial and sentencing.  We refer to the attorneys collectively using the singular terms "trial counsel" and "counsel."

[8] We note that Escalante makes no argument against forfeiture in this case.  Instead, he asserts only a claim of ineffective assistance of counsel based on his trial counsel's failure to object despite having information illustrating his indigency.

[9] Panels of this court and other Courts of Appeal have reached differing conclusions on whether *Dueñas* was correctly decided, and the issue is pending before the California Supreme Court.  (See, e.g., *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844 (*Kopp*); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1067 (*Aviles*) [concluding that *Dueñas* was wrongly decided and its "analysis is 'fundamentally flawed in that general "fairness" grounds of due process and/or equal protection principles do not afford a defendant a preassessment ability-to-pay hearing before a trial court imposes fines and fees on him or her.' "]; *Hicks*, *supra*, 40 Cal.App.5th at p. 325, review granted; *People v. Adams* (2020) 44 Cal.App.5th 828, 831–

Similarly, in *Cowan*, the Court of Appeal concluded that "[b]ecause ability to pay is an element of the excessive fines calculus under both the federal and state Constitutions," "a sentencing court may not impose court operations or facilities assessments or restitution fines without giving the defendant, on request, an opportunity to present evidence and argument why such monetary exactions exceed his ability to pay." (*Cowan*, *supra*, 47 Cal.App.5th at p. 48 [review granted and the matter deferred pending consideration and disposition of a related issue in *Kopp*, *supra*, 38 Cal.App.5th 47, review granted.)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.) We can reject an ineffective assistance of counsel claim if the defendant fails to establish either element of the *Strickland* standard. (See *Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective

832 [concluding that "*Dueñas* was wrongly decided"]; *People v. Petri* (2020) 45 Cal.App.5th 82, 90 [finding that *Dueñas* was not "persuasive"].) For the reasons stated *post* regarding ineffective assistance of counsel, we need not address the merits of *Dueñas* in this case.

13

assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, the record does not disclose why Escalante's trial counsel failed to object to the $5,000 restitution fine, the $160 court operations assessment, or the $120 court facilities assessment or request a hearing on Escalante's ability to pay those amounts.[10] There is no indication that trial counsel was asked for a reason for the inaction and failed to provide one. Moreover, we cannot say there could be no satisfactory explanation for trial counsel's inaction regarding the restitution fine and assessments. Escalante was 29 years old in July 2021, when he was sentenced to 50 years to life in prison plus 10 years four months. According to the trial evidence and probation report, at the time of his arrest in August 2019, Escalante had been working as a union journeyman construction worker for four years and had previously held other construction jobs.

Given Escalante's employment history, trial counsel could have reasonably concluded that Escalante had an ability to pay at least some of the aggregate $5,280 with saved earnings and/or other benefits he might have accrued while working as a union construction worker. That Escalante did not have enough money to employ defense counsel for trial does not mean he had no assets at all. (See § 859 ["the court shall assign counsel to defend" a defendant if the defendant "is unable to employ counsel"]; Gov. Code, § 27706, subd. (a); see also *In re Smiley* (1967) 66 Cal.2d 606, 620.)

Furthermore, counsel could have reasonably considered Escalante's ability to earn wages in prison as another reason for not objecting or requesting an ability-to-pay hearing. (See *Aviles*, *supra*, 39 Cal.App.5th at pp. 1062, 1076–1077 [concluding that a defendant sentenced to a prison term of 82 years to life had the ability to pay $10,600 in restitution fines, $160 in court operations assessments, and $120 in court facilities

---

**[10]** We note that the probation officer's report recommended that Escalante be ordered to pay a restitution fine of $10,000, but the trial court ultimately chose to impose one-half that amount.

assessments from either prison wages or monetary gifts from family and friends during his lengthy prison sentence]; see also *People v. Jones* (2019) 36 Cal.App.5th 1028, 1035.) " '[E]very able-bodied prisoner' must work while imprisoned. [Citation.] Prison wages range from $12 to $56 per month, depending on the job and skill level involved. [Citation.] Up to 50 percent of [a prisoner's] wages and trust account deposits will be deducted to pay any outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction." (*People v. Cervantes* (2020) 46 Cal.App.5th 213, 229.) " '[A]n inmate's assignment to a paid position is a privilege dependent on available funding, job performance, seniority and conduct.' " (*Ibid.*) We acknowledge that Escalante would have to work for many years in prison to earn enough to pay off the amount imposed, but he is relatively young, there is no indication he is unhealthy or unable to work, and he need only pay $7.33 per month to fully satisfy his financial obligation over the 60 years imposed on him.

Additionally, Escalante has not demonstrated for purposes of the excessive fines clause that the aggregate amount imposed is grossly disproportionate to his level of culpability and the harm he caused, even assuming the validity of his assertion of indigency. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1048–1049, 1058.) That trial counsel failed to make a futile objection based on the protection against excessive fines does not amount to deficient performance. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 463.) For these reasons, we cannot conclude on the record before us that trial counsel provided deficient representation to Escalante.

Even if we were to conclude that Escalante's trial counsel performed deficiently by failing to object and to request an ability-to-pay hearing, Escalante has not met his burden to show prejudice resulting from counsel's failure. Again, the facts in the record do not demonstrate that Escalante is and will be unable to pay the $5,280 or that the amount imposed is excessive. Thus, we cannot say there is a reasonable probability the result of Escalante's sentencing would have been more favorable to him, in that the trial

court would have further reduced or eschewed the restitution fine and assessments had trial counsel objected and requested a hearing.  (See *People v. Keene* (2019) 43 Cal.App.5th 861, 864–865.)

## III.  DISPOSITION

The judgment is affirmed.

_____
                Danner, J.


WE CONCUR:




_____
Bamattre-Manoukian, Acting P.J.






_____
Wilson, J.




**H049361**
***People v. Llamas-Escalante***